# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## LITTLE ROCK DIVISION

### CAPITAL CASE

**JASON MCGEHEE,** *et al.*                                      **PLAINTIFFS**

**v.**                    **Case No. 4:17-cv-00179 KGB**

**ASA HUTCHINSON,** *et al.*                                   **DEFENDANTS**

## PRELIMINARY INJUNCTION ORDER

Before the Court is a motion for preliminary injunction filed by plaintiffs Jason McGehee, Stacey Johnson, Marcel Williams, Kenneth Williams, Bruce Ward, Ledell Lee, Jack Jones, Don Davis, and Terrick Nooner (Dkt. No. 3). Defendants Asa Hutchinson, who is sued in his official capacity as Governor of Arkansas, and Wendy Kelley, who is sued in her official capacity as Director of the Arkansas Department of Correction ("ADC"), responded to plaintiffs' motion and filed a motion to dismiss this action (Dkt. Nos. 26; 28). Plaintiffs replied to defendants' response to their motion for a preliminary injunction and responded to defendants' motion to dismiss (Dkt. No. 31). By previous Order, the Court granted in part and denied in part defendants' motion to dismiss (Dkt. No. 53).

Plaintiffs bring this action to challenge the method of their execution, as well as other policies that they claim deny them the right to counsel and access to courts. Before turning to the matters that are presented in this action, the Court notes two important issues that are not.

1.      The death penalty is constitutional. *See Glossip v. Gross*, 135 S. Ct. 2726, 2732 (2015) (recognizing that "it is settled that capital punishment is constitutional").

2.     Competency issues aside, plaintiffs are eligible to receive it.  Each of these nine men was convicted by a jury of their peers and then sentenced to death.  Their sentences have survived a number of legal challenges.

The Eighth Amendment to the United States Constitution prohibits cruel and unusual punishment.  Torture and other "inherently barbaric punishments" violate the Eighth Amendment.  *Graham v. Florida*, 560 U.S. 48, 59 (2010), *as modified* (July 6, 2010).  Ancient practices such as burning at the stake, drawing and quartering, and crucifixion, which go beyond "'the mere extinguishment of life' and cause 'torture or a lingering death[,]'" would not survive an Eighth Amendment challenge.  *Glass v. Louisiana*, 471 U.S. 1080, 1084 (1985) (Brennan, J., dissenting) (citing *In re Kemmler*, 136 U.S. 436, 447 (1890)).

The state of Arkansas does not intend to torture plaintiffs to death.  However, the Eighth Amendment's prohibition of cruel and unusual punishment is not limited to inherently barbaric punishments.  A condemned prisoner can successfully challenge the method of his or her execution by showing that the state's method "creates a demonstrated risk of severe pain" and "the risk is substantial when compared to the known and available alternatives."  *Id.*, at 2737 (2015) (quoting *Baze v. Rees*, 553 U.S. 35, 61 (2008)).  Plaintiffs argue that Arkansas's lethal injection protocol violates the Eighth Amendment under this standard.

The Court permitted limited expedited discovery and held evidentiary hearings on plaintiffs' motion for a preliminary injunction on April 10 to 13, 2017.  Based on the evidence presented in the parties' filings and at the hearing, the Court finds that there is a significant possibility that plaintiffs will succeed on the merits of their Eighth Amendment challenge to Arkansas's lethal injection protocol.  The other factors that the Court must consider in evaluating a motion for a preliminary injunction under these circumstances also weigh in plaintiffs' favor.

Therefore, the Court grants plaintiffs' motion for a preliminary injunction (Dkt. No. 3). Defendants and all persons in active concert with them are enjoined during the pendency of this action from carrying into execution the death sentences of Jason McGehee, Stacey Johnson, Marcel Williams, Kenneth Williams, Bruce Ward, Ledell Lee, Jack Jones, Don Davis, and Terrick Nooner.

The Court is mindful of the fact that the state of Arkansas has not executed an inmate since 2005, despite consistent support for capital punishment from Arkansawyers and their elected representatives. It is their right to decide whether the death penalty should be a form of punishment in Arkansas, not the Court's. The friends and family of those killed or injured by Jason McGehee, Stacey Johnson, Marcel Williams, Kenneth Williams, Bruce Ward, Ledell Lee, Jack Jones, Don Davis, and Terrick Nooner have waited decades to receive some closure for their pain. By this Order, that day is delayed yet again.

These thoughts weigh heavily on the Court, but the Court has a responsibility to uphold the Constitution. After hearing the evidence presented by the parties, the Court is compelled to stay these executions.

I.      **Lethal Injection In Arkansas**

In 1983, the Arkansas General Assembly phased out electrocution as a means of executing inmates and adopted lethal injection as the primary method of execution through the Method of Execution Act ("MEA"). *See* Act 774, 1983 Ark. Acts 1804, 1804 (codified as amended at Ark. Code Ann. § 5-4-617 (repealed 2006)). The 1983 version of the MEA provided that the "punishment of death is to be administered by a continuous intravenous injection of a lethal quantity of an ultra-short-acting barbiturate in combination with a chemical paralytic agent until the defendant's death is pronounced according to accepted standards of medical practice." Ark.

Code Ann. § 5-4-617(a)(1) (repealed 2006). Every execution by lethal injection carried out by the state of Arkansas has been "in accordance with the original MEA enacted in 1983." Lauren E. Murphy, *Third Time's A Charm: Whether Hobbs v. Jones Inspired A Durable Change to Arkansas's Method of Execution Act,* 66 Ark. L. Rev. 813, 817 (2013).

In 2008, a condemned inmate named Frank Williams, Jr., filed an action for a declaratory judgment alleging that the ADC had promulgated a new execution protocol in violation of the Arkansas Administrative Procedures Act and in violation of the 1983 version of the MEA because the protocol permitted "a lethal injection cocktail made up of three drugs, rather than the statutorily prescribed two; and . . . establish[ed] a lethal injection procedure that [was] not 'continuous.'" *Arkansas Dep't of Correction v. Williams*, 357 S.W.3d 867, 868 (Ark. 2009). The trial court awarded Mr. Williams partial declaratory relief after finding that the ADC's execution protocol was invalid, as it was subject to the Arkansas Administrative Procedures Act. *Id.*, at 869. The ADC appealed the trial court's decision.

Before the appeal reached the Arkansas Supreme Court, the Arkansas legislature amended the MEA to exempt the "policies and procedures for carrying out the sentence of death and any and all matters related to the policies and procedures for the sentence of death" from the Arkansas Administrative Procedure Act. Ark. Code Ann. § 5-4-617 (2009) (amended 2013). The amended 2009 version of the MEA also provided that the chemicals used in lethal injection:

[M]ay include one (1) or more of the following substances:

    (A)    One (1) or more ultra-short-acting barbiturates;

    (B)    One (1) or more chemical paralytic agents;

    (C)    Potassium chloride; or

    (D)    Any other chemical or chemicals, including but not limited to saline solution.

Ark. Code Ann. § 5-4-617 (2009) (amended 2013).

In 2012, the Arkansas Supreme Court held that the 2009 version of the MEA violated the Arkansas Constitution because "the legislation granted ADC the unfettered discretion to determine all protocols and procedures for implementing executions, including the chemicals to be used." *Kelley v. Johnson*, 496 S.W.3d 346, 351 n.1 (Ark. 2016), *reh'g denied* (July 21, 2016), *cert. denied*, 137 S. Ct. 1067 (2017) (citing *Hobbs v. Jones*, 412 S.W.3d 844, 856 (Ark. 2012)). The Arkansas legislature subsequently passed an amended 2013 version of the MEA providing that the ADC "shall carry out the sentence of death by intravenous lethal injection of a barbiturate in an amount sufficient to cause death[,]" and that "[b]efore the intravenous lethal injection is administered, the condemned prisoner shall be intravenously administered a benzodiazepine." Ark. Code Ann. § 5-4-617 (2013) (amended 2015). The 2013 version of the MEA reaffirmed that execution procedures are not subject to the Arkansas Administrative Procedures Act and "also exempted information about execution procedures and their implementation from the Arkansas Freedom of Information Act (FOIA)." *Kelley*, 496 S.W.3d at 351. The 2013 version of the MEA also provided that the ADC "shall carry out the sentence of death by electrocution if this section is invalidated by a final and unappealable court order." Ark. Code Ann. § 5-4-617(h) (2013) (amended 2015).

Condemned prisoners sued again, claiming that the 2013 version of the MEA "violated the separation-of-powers doctrine under the Arkansas Constitution." *Id.* After the lawsuit was filed, the prisoners and the ADC entered into a settlement agreement. *Id.* As a part of the settlement agreement, the ADC, which "had decided not to employ the then existing lethal-injection protocol, . . . agreed to provide a copy of the new protocol, and once the selected drugs were obtained, to 'disclose the packaging slips, package inserts, and box labels received from the supplier.'" *Id.* The plaintiffs' facial challenge to the 2013 version of the MEA continued despite the settlement,

and in 2015, the Arkansas Supreme Court held that the 2013 version of the MEA "did not violate separation of powers because the statute provided reasonable guidelines to ADC in determining the method to use in carrying out the death penalty." *Id.* (citing *Hobbs v. McGehee,* 458 S.W.3d 707 (Ark. 2015)).

In 2015, the Arkansas legislature amended the MEA again, and this version of the statute is currently in effect. The current 2015 version of the MEA provides that the ADC:

> Shall select one (1) of the following options for a lethal-injection protocol, depending on the availability of the drugs:
>
> > (1) A barbiturate; or
> >
> > (2) Midazolam, followed by vecuronium bromide, followed by potassium chloride.

Ark. Code Ann. § 5-4-617 (2015). Like the 2013 version of the MEA, the current law provides that the ADC shall carry out the sentence of death by electrocution if execution by lethal injection under this section is invalidated by a final and unappealable court order." Ark. Code Ann. § 5-4-617(k). The current law, which maintains the FOIA exemption included in the 2013 version of the MEA, also provides that the ADC:

> [S]hall keep confidential all information that may identify or lead to the identification of:
>
> > (A)    The entities and persons who participate in the execution process or administer the lethal injection; and
> >
> > (B)    The entities and persons who compound, test, sell, or supply the drug or drugs described in subsection (c) of this section, medical supplies, or medical equipment for the execution process.

Ark. Code Ann. § 5-4-617(i).

Condemned prisoners sued again, claiming that the 2015 version of the MEA violated the Arkansas Constitution. The Arkansas Supreme Court dismissed prisoners' action against Director

Kelley and the ADC based on sovereign immunity. *See Kelley*, 496 S.W.3d 350 (dismissing plaintiffs' amended complaint based on sovereign immunity).[1] As a result of this history of litigation, the state of Arkansas has not executed an inmate since 2005.

## II.     Applicable Evidentiary Standards

As a preliminary matter, the Court will address evidentiary issues raised before and during the Court's evidentiary hearing. The Court has discretion to consider evidence in connection with a motion for preliminary injunction, including hearsay evidence, which would otherwise be inadmissible at trial. *See Univ. of Tex. v. Camenisch,* 451 U.S. 390, 395 (1981) ("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits."); *Asseo v. Pan Am. Grain Co*., 805 F.2d 23, 26 (1st Cir. 1986); *Mullins v. City of New York*, 626 F.3d 47, 52 (2nd Cir. 2010) ("[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction. The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage."); *Sierra Club, Lone Star Chapter v. F.D.I.C*., 992 F.2d 545, 551 (5th Cir. 1993) (stating that a "district court may rely on otherwise inadmissible evidence, including hearsay" in deciding a motion for preliminary injunction); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2949, at 239-40 ("[I]n practice[,] affidavits usually are accepted on a preliminary injunction motion without regard to the strict standards of Rule 56(c)(4), and [ ] hearsay evidence also may be considered.").

The Court, therefore, in its discretion will consider all evidentiary submissions at this stage, giving these submissions appropriate weight, without regard to whether these evidentiary

_____

[1] The Court addresses these legal activities in more detail later in this Order and in its Order on defendants' motion to dismiss (Dkt. No. 53).

submissions meet the strict evidentiary requirements in place at either the summary judgment or trial stage. The Court denies the parties' objections lodged to documentary evidence submitted with their filings. The Court applied these same standards at the four-day evidentiary hearing conducted in this matter.

For these reasons, the Court denies plaintiffs' pending motion *in limine* to exclude or limit testimony of Daniel E. Buffington, one of defendants' witnesses (Dkt. No. 30). The Court did not apply the standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589, 597 (1993), at this stage of the proceeding. However, the Court has considered the arguments made in support of the motion to exclude when evaluating Dr. Buffington's testimony.

The Court also specifically addresses certain categories of objections raised by the parties. Defendants lodged a continuing relevance objection to evidence regarding executions involving midazolam protocols from other states. Although defendants' concern is well taken as a reservation on how directly probative other executions may be, the Court overruled the objection, admitted the evidence, and cannot say it has no probative value at this stage of the proceedings. The parties also submitted to the Court for consideration sworn testimony from other prior proceedings, including certain expert testimony from lethal injection cases different from this one, that did not involve the parties to this case and that may not have involved a similar midazolam protocol. Although the Court admitted these transcripts, the Court recognizes this testimony was not given in this case or subject to cross examination by these lawyers. Further, some of this testimony is dated.

During cross examination of many witnesses, counsel explored bias regarding witness views on the death penalty. In this Court's view, to the extent a witness testifying for plaintiffs

can be characterized as anti-death penalty, a witness testifying for defendants can be characterized as pro-death penalty. As a result, these allegations of purported bias neutralize one another.

### III.    Findings Of Fact

Based on the parties' filings and evidentiary submissions, the Court makes the following preliminary findings of fact:

### A.    The Parties

1.    Plaintiffs are nine inmates currently on death row in Arkansas.

2.    Plaintiffs are currently incarcerated at the Varner facility of the Arkansas Department of Correction ("ADC"), which is in the Eastern District of Arkansas and under defendants' supervision and control.

3.    Governor Hutchinson set eight of their execution dates for an 11-day period in April 2017, with two executions to occur back-to-back on four separate nights.

4.    The executions are scheduled as follows, with the first execution being scheduled for 7:00 p.m. and the second execution scheduled for 8:15 p.m. each night. The order of executions on each date is determined by the prisoner's SK number:

    April 17, 2017-        Don Davis and Bruce Ward

    April 20, 2017-        Stacey Johnson and Ledell Lee

    April 24, 2017-        Marcel Williams and Jack Jones

    April 27, 2017-        Jason McGhee and Kenneth Williams

5.    Plaintiff Terrick Nooner does not yet have a pending execution date.

6.    Plaintiffs Jason McGhee and Bruce Ward's execution dates were stayed by Orders entered in separate proceedings.

7.     Director Kelley or her designee is statutorily responsible for "order[ing] the dispensation and administration of the drug or drugs . . . for the purpose of carrying out the legal-injection procedure."  Ark. Code Ann. § 5-4-617(b).

8.     Director Kelley is statutorily responsible for conducting "an execution for a sentence of death" or for designating "some assistant or assistants" to do so.  Ark. Code Ann. § 16-90-502(b), (d).

9.     Director Kelley alone is responsible for "develop[ing] logistical procedures necessary to carry out the sentence of death."  Ark. Code Ann. § 5-4-617(g).

10.    Governor Hutchinson has final executive authority in the State of Arkansas and is statutorily responsible for setting execution dates by warrant.  Ark. Code Ann. § 16-90-507(a).

11.    Governor Hutchinson has the power to suspend execution of a judgment of death.  Ark. Const. art. 6, § 18; Ark. Code Ann. § 16-90-506(c)(1).

### B.     Arkansas's Lethal-Injection Protocol

12.    The current version of the Arkansas MEA provides two options for execution by lethal injection:  "(1) a barbiturate; or (2) Midazolam, followed by vecuronium bromide, followed by potassium chloride."  Ark. Code Ann. § 5-4-617(c).

13.    This version of the Arkansas MEA took effect on April 6, 2015.

14.    Director Kelley has adopted and made public a written document regarding lethal-injection protocol for executions using midazolam ("Arkansas Midazolam Protocol") (Dkt. No. 2-2, Exhibit 1, at 66-71).[2]

---

[2] In certain filings and during the proceedings in this case, counsel and the parties have referred to the Arkansas Midazolam Protocol as "Attachment C."

15.     The Arkansas Midazolam Protocol describes the procedure for mixing the execution drugs and for injecting them into plaintiffs. The Arkansas Midazolam Protocol calls for the drugs to be administrated in the following manner. First, the executioner will inject 500 milligrams ("mg") of midazolam. Second, five minutes after the midazolam has been injected, the executioner will inject 100 mg of vecuronium bromide, which is intended to paralyze the condemned inmate. Third, the executioner will inject 240 milliequivalents ("mEq") of potassium chloride, which is intended to stop the condemned inmate's heart and to cause his death (Arkansas Midazolam Protocol).

16.     Between injection of the midazolam and injection of the vecuronium bromide, the Arkansas Midazolam Protocol calls for the ADC's Deputy Director, or his desginee, to "confirm the condemned inmate is unconscious by using all necessary and medically-appropriate methods" (Arkansas Midazolam Protocol).

17.     Under the Arkansas Midazolam Protocol, if the condemned inmate remains conscious after the first injection of midazolam, the executioner will inject another 500 mg of midazolam (Arkansas Midazolam Protocol).

18.     The Arkansas Midazolam Protocol is silent on what happens if the condemned inmate remains conscious after that (Arkansas Midazolam Protocol).

19.     The Arkansas Midazolam Protocol calls for IV lines to be set up by an unknown number of people called the "IV team." (Arkansas Midazolam Protocol).

20.     Members of the IV team are to have at least two years of professional experience in one of the following disciplines: emergency medical technician – intermediate; emergency medical technician – paramedic; nurse; physician assistant; or physician (Arkansas Midazolam Protocol).

21.     The Deputy Director, of his designee, who is the person directly in charge in the execution chamber, is not required to have these qualifications, though he or she must be "healthcare trained, educated, and/or experienced in matters related to the establishment and monitoring of IVs, the mixing and administration of the chemicals, and assessing the presence or absence of consciousness" (Arkansas Midazolam Protocol).

22.     If there is a problem with the IV lines, "trained, educated and experienced person(s) necessary to establish a primary IV line as a peripheral line or as a central venous line will be summoned to facilitate an IV infusion site" (Arkansas Midazolam Protocol).

### C.     Plaintiffs' Efforts To Obtain Additional Information Prior To Litigation

23.     Director Kelley's counsel responded to requests from plaintiffs' counsel for additional information in a letter dated March 15, 2017 (Dkt. No. 2-2, Exhibit 3).

24.     In her response, Director Kelley:

a.     confirmed the Arkansas Midazolam Protocol in effect;

b.     confirmed that the ADC has no additional records, beyond the Arkansas Midazolam Protocol, related to that portion of the lethal injection procedure determining whether the inmate is unconscious;

c.     confirmed that the ADC has no additional records, beyond the Arkansas Midazolam Protocol, related to that portion of the lethal injection procedure regarding the ADC's "contingency plan," including but not limited to stopping the execution, should the prisoner appear to be conscious after administration of the backup syringes or should the prisoner show movement at any point during the execution;

d.     asserted that any records establishing the credentials of each member of the IV team under the Arkansas Midazolam Protocol would be exempt from disclosure and that any records regarding whether the composition of the team will change from execution to execution are exempt from disclosure;

e.     confirmed that the ADC has no additional records, beyond the Arkansas Midazolam Protocol, related to the potential suspension of the execution procedure;

f.      asserted that any records regarding the qualifications of the "Deputy Director or designee" as described in the Arkansas Midazolam Protocol are exempt from disclosure;

g.      asserted that requested records related to the execution schedule and logistics are exempt from disclosure; and

h.      confirmed that the Arkansas Midazolam Protocol had not changed since August 6, 2015, and that any additional records regarding the ADC's execution protocols would be exempt from disclosure.

(Dkt. No. 2-2, Exhibit 3).

**D.    Prior Midazolam Executions**

25.     Since 2014, there have been at least four executions across the United States using midazolam that plaintiffs focus attention on in this action.

26.     On January 16, 2014, Ohio executed Dennis McGuire using a combination of 10 mg midazolam and 40 mg hydromorphone. The execution took 25 minutes and "was accompanied by movement and gasping, snorting and choking sounds." Erica Goode, *After a Prolonged Execution in Ohio, Questions over "Cruel and Unusual,"* N.Y. Times, Jan. 17, 2014, available at http://nyti.ms/2g1QUyI.

27.     On July 23, 2014, Arizona executed Joseph Wood by injecting him with 750 mg midazolam and 750 mg hydromorphone.

28.     Mr. Wood "gasped and snorted for nearly two hours" before he finally died. *Glossip*, 135 S. Ct. at 2791; *see also* Mark Berman, *Arizona Execution Lasts Nearly Two Hours; Lawyer Says Joseph Wood Was "Gasping and Struggling to Breathe,"* Wash. Post, July 23, 2014, http://wapo.st/2nsiJrk.

29.     Mr. Wood's attorneys convened a hearing with the presiding judge during the execution in which they moved the Court, after approximately an hour and a half from the start of the execution, to order the state to stop the execution and require the Arizona Department of

Corrections to use lifesaving provisions required in its protocol (Dkt. No. 2-2, Exhibit 5). Mr. Wood was pronounced dead during that telephonic hearing with the Court (*Id.*)

30.     Dale Baich, counsel for Mr. Wood, testified about his observations during Mr. Wood's execution and his decision to seek court intervention during the prolonged execution (Dale Baich Testimony, April 11, 2017, Vol. 2, at 494 – 536 ("Baich Testimony")).

31.     Director Kelley maintains that Mr. McGuire's execution in Ohio and Mr. Wood's execution in Arizona used different protocols from the Arkansas Midazolam Protocol. She maintains that those states used a small dose of midazolam followed by a large dose of an opiod painkiller instead of the large dose of midazolam that is not followed by an opiod as called for in Arkansas's protocol (Dkt. No. 28-1, at 6-7).

32.     On April 29, 2014, Oklahoma executed Clayton Lockett using 100 mg midazolam followed by a paralytic and potassium chloride. Mr. Lockett awoke during administration of the second and third drugs. Though the execution was halted, Mr. Lockett died 40 minutes after the execution began. *See Glossip*, 135 S. Ct. at 2782 (Sotomayor, J., dissenting).

33.     Mr. Lockett's execution was scheduled to be a double execution, with Mr. Lockett's execution to be followed by the execution of Charles Warner. Mr. Warner's execution did not go forward that night.

34.     Ziva Branstetter, who is an investigative journalist and was working at the *Tulsa World* at the time of Mr. Lockett's execution, witnessed that attempted execution (Branstetter Testimony, April 11, 2017, Vol. 2, at 388- 432 ("Branstetter Testimony")).

35.     As a journalist, Ms. Branstetter has witnessed four executions in Oklahoma (Branstetter Testimony).

36.     Ms. Branstetter took a minute-by-minute account of the attempted execution because, as a witness, she was permitted a pen and paper inside the death chamber (Branstetter Testimony).

37.     She testified that, three minutes after Mr. Lockett was declared unconscious by a medical doctor or military equivalent as required by Oklahoma's then-in effect protocol, Mr. Lockett kicked his right leg, rolled his head to the side, and mumbled something. Then, she wrote, and many others wrote based on what they observed, that it looked like Mr. Lockett tried to get up off the table, with his body writhing and bucking (Branstetter Testimony).

38.     After Mr. Lockett's experience, the Governor of Oklahoma appointed the Secretary of Safety and Security and Department of Public Safety Commissioner ("Oklahoma Department of Safety and Security") "to conduct an independent review of the events leading up to and during [Mr.] Lockett's execution." (Dkt. No. 2-2, Exhibit 4, at 83; Plaintiffs' Hearing Exhibit 19).

39.     This report goes into considerable detail about the investigation and the results of the investigation (Dkt. No. 2-2, Exhibit 4; Plaintiffs' Hearing Exhibit 19).

40.     In her capacity as an investigative reporter, Ms. Branstetter read over 101 transcripts of interviews the State of Oklahoma conducted. She confirmed that "maybe one or two witnesses who were sort of very official types for the government said, oh, maybe he had a seizure. Everyone across the board thought that he was trying to get up. The executioner, the paramedic, the doctor, the warden." (Branstetter Testimony).

41.     The Oklahoma Department of Safety and Security determined that, in regard to department protocols, the Oklahoma Department of Corrections followed their current execution protocols, with minor deviations from specific requirements outlined in the protocol in effect on April 29 but, despite that, the protocol was substantially and correctly complied with throughout

the entire process and that none of the deviations contributed to the complications encountered during the execution (Dkt. No. 2-2, Exhibit 4, at 95; Plaintiffs' Hearing Exhibit 19).

42.     The Oklahoma Department of Public Safety's investigation "revealed areas of training that need to be addressed" for the paramedic, the physician or executioners, and the Department of Correction personnel (Dkt. No. 2-2, Exhibit 4, at 103; Plaintiffs' Hearing Exhibit 19).

43.     The Oklahoma Department of Public Safety's investigation revealed "limited provisions for contingencies once the execution process began" and what the Oklahoma Department of Public Safety termed "cessation of execution protocols," meaning how to stop the execution and whether to provide life-saving measures (Dkt. No. 2-2, at 103; Plaintiffs' Hearing Exhibit 19).

44.     The Oklahoma Department of Public Safety determined:

> It was apparent the stress level at OSP was raised because two executions had been scheduled on the same day. This was the first time since 2000 two offenders were scheduled to be executed on the same day. Four days prior to the execution, the protocol was revised to accommodate the logistics for two offenders.
>
> Several comments were made about the feeling of extra stress. Warden Trammell believed this caused extra stress for all staff. The paramedic stated he/she felt stress and a sense of urgency. . . This was based on him/her having been involved in numerous executions.

(Dkt. No. 2-2, at 104; Plaintiffs' Hearing Exhibit 19).

45.     The Oklahoma Department of Public Safety made several recommendations based on its investigation (Dkt. No. 2-2, at 107-10; Plaintiffs' Hearing Exhibit 19).

46.     Among these recommendations, the Oklahoma Department of Public Safety concluded that executions should be spaced at least seven days apart (Dkt. No. 2-2, Exhibit 4; Plaintiffs' Hearing Exhibit 19).

47. Also among these recommendations, the Oklahoma Department of Public Safety concluded that the Department of Correction should "evaluate and establish protocols and training for possible contingencies if an issue arises during the execution procedure." (Dkt. No. 2-2, Exhibit 4, at 108; Plaintiffs' Hearing Exhibit 19).

48. Director Kelley claims that Mr. Lockett's execution in Oklahoma occurred under circumstances different than those called for in the Arkansas Midazolam Protocol in that there were problems with Mr. Lockett's IV site that corrections officials did not discover until it was too late (Dkt. No. 28-1, at 7).

49. Director Kelley maintains that the Arkansas Midazolam Protocol calls for two infusion sites so that drugs can be redirected to a viable infusion site if necessary (Dkt. No. 28-1, at 7).

50. On December 8, 2016, Alabama executed Ronald Bert Smith using 500 mg of midazolam followed by 600 mg of rocuronium bromide followed by 240 mEq potassium chloride.

51. During the execution, which took 34 minutes, Mr. Smith "was apparently struggling for breath as he heaved and coughed for about 13 minutes." Mark Berman & Robert Barnes, After Divided Supreme Court Allows Alabama Execution, Inmate Heaves and Coughs During Lethal Injection, Wash. Post, Dec. 9, 2016, available at http://wapo.st/2hnRs7p.

52. According to Spencer Hahn, an attorney for Mr. Smith who was present at the execution and who testified before this Court, two minutes after the midazolam began flowing, Mr. Smith began having "regular asthmatic-sounding barking coughs every ten seconds or so." (Dkt. No. 2-2, Exhibit 6, ¶ 7). "He also lifted his head and looked around, moved his arms, clenched his left hand, and moved his lips in what appeared to be an attempt to say something. [His] eyes never closed, and he moved and coughed regularly throughout approximately the next

fifteen minutes." (*Id.*) Mr. Smith was awake after the first consciousness check, "as he was still moving his head, hands and arms, coughing, and attempting to speak." (Id., ¶ 8). After the second consciousness check, Mr. Smith's "eyes remained open" (despite a guard's attempt to push his left eye closed), and Mr. Smith "moved his right arm" (*Id.*, ¶¶ 10-11). "Shortly thereafter, they must have administered the paralytic, as [Mr. Smith's] breathing became very shallow and he stopped moving. His eyes remained open, with the left eye opening further as his breathing became imperceptible" (*Id.*, ¶ 11) (Spencer Hahn Testimony, April 11, 2017, Vol. 2, at 363 – 388 ("Hahn Testimony")).

53.      Director Kelley admits that the protocol Alabama used during Mr. Smith's execution is essentially the same as the Arkansas Midazolam Protocol (Dkt. No. 28-1, at 8).

54.      According to Director Kelley, Alabama corrections officials do not consider Mr. Smith's execution to have been "botched," and have no plans to change Alabama's protocol (Dkt. No. 28-1, at 8).

55.      Referenced in the testimony of certain witnesses is the attempted execution of Rommell Broom. During Romell Broom's attempted 2009 execution in the State of Ohio, executioners repeatedly pierced Mr. Broom with needles for an extended period as they tried unsuccessfully to find a vein (Testimony of Carol Wright, April 10, 2017, Vol. 1, 178 – 212 ("Wright Testimony")); Testimony of Dr. Groaner, April 12, 2017, Vol. 3, at 579-616 ("Groaner Testimony")).

### E.      Use Of Midazolam In Other States

56.      Director Kelley has no medical training (Wendy Kelley Testimony, April 13, 2017, Vol. 4, at 1112 – 1287 ("Kelley Testimony, Vol. 4")).

57.     Director Kelley talked to corrections officials in multiple states, including Florida, Virginia, Ohio, Oklahoma, Arizona, and Alabama regarding their experience with midazolam as a lethal agent (Dkt. No. 28-1, at 5).

58.     Based on her conversations, she learned that midazolam has been used in approximately 20 executions in other states (Dkt. No. 28-1, at 5).

59.     Not all of those states' corrections officials to whom Director Kelley has spoken use the same three-drug protocol as the Arkansas Midazolam Protocol (Dkt. No. 28-1, at 5).

60.     Several states no longer use midazolam protocols for executions.

61.     Arizona has recently agreed that it will never again use midazolam in an execution.

62.     Florida has eliminated midazolam from its most recent execution protocol.

63.     Director Kelley stated in an affidavit submitted in this case that the State of Florida carried out approximately 15 executions using the same midazolam protocol as will be used in Arkansas and has not experienced the problems plaintiffs allege in their complaint (Dkt. No. 28-1, at 6).

64.     Florida began using midazolam in executions in 2013 (Dkt. No. 28-1, at 6).

65.     According to conversations Director Kelley had with a senior corrections official in Florida, whom she does not identify, Florida changed its protocol to no longer use midazolam because it ran out of midazolam and could not find a supplier willing to sell it.  She claims that is the only reason for the change in Florida's protocol and that, if Florida could obtain midazolam, Florida would still be using it (Dkt. No. 28-1, at 6).

66.     According to Director Kelley, Virginia uses compounded midazolam as the first drug in a three-drug execution protocol.  She claims Virginia compounds the drug because it cannot obtain a bulk-manufactured, FDA approved drug.  According to Director Kelley, Virginia

successfully used midazolam in one execution in January 2017 and plans to use it again (Dkt. No. 28-1, at 6).

## F. Arkansas's Drug Supply

67.     The state of Arkansas allows Director Kelley to choose the quality of the drugs she will use in the executions.  The drugs may be "approved by the United States Food and Drug Administration ("FDA") and made by a manufacturer approved by the [FDA]" or they may be "obtained by a compounding pharmacy that has been accredited by a national organization that accredits compounding pharmacies."  Ark. Code Ann. § 5-4-617(d).

68.     FDA-approved drugs come with manufacturer-provided labels; compounded drugs do not.

69.     Director Kelley has previously provided redacted labels for the midazolam and the vecuronium bromide.

70.     Director Kelley obtained the ADC's supply of midazolam in November 2015 (Plaintiffs' Hearing Exhibit 29).

71.     Director Kelley provided plaintiffs with a redacted report showing the midazolam was sufficiently potent at that time it was acquired (Plaintiffs' Hearing Exhibit 29).

72.     Director Kelley obtained the ADC's supply of potassium chloride. (Kelley Testimony, Vol. 4).

73.     The source of the potassium chloride requested to remain anonymous and declined to be paid for the drug so as to avoid having to process an invoice for payment and risk the source being identified (Kelley Testimony, Vol. 4).

74.     Director Kelley did not obtain the current supply of execution drugs from any manufacturer (Kelley Testimony, Vol. 4).

75.     The last time Director Kelley attempted to obtain a barbiturate was after the Arkansas legislature passed the 2015 version of the Arkansas MEA.  Her efforts were not successful (Kelley Testimony, Vol. 4).

76.     If Director Kelley could obtain a barbiturate, that would be her preferred execution method (Kelley Testimony, Vol. 4).

77.     The last time Director Kelley obtained a barbiturate, the Drug Enforcement Agency confiscated it because she had obtained it from outside of the United States (Kelley Testimony, Vol. 4).

78.     Director Kelley is aware of no current source for a barbiturate (Kelley Testimony, Vol. 4).

79.     A potential source of execution drugs required Director Kelley to produce a copy of the 2015 version of the MEA before the source would consider her request (Kelley Testimony, Vol. 4).

80.     Director Kelley submitted an affidavit in the Arkansas state court litigation in October 2015 and stated she had attempted to obtain a barbiturate.  She made three efforts to obtain that drug:  she contacted a past supplier who supplied the other three execution drugs, she contacted a second past supplier of execution drugs, and she contacted a compounding pharmacy.  All three potential sources refused (Kelley Testimony, Vol. 4).

81.     When Director Kelley spoke to the Governor's Office about the scheduled executions, she may not have had potassium chloride.  She obtained the potassium chloride in 2017, within the past month or so (Kelley Testimony, Vol. 4).

### G. Execution Schedule

82. In Arkansas, the Governor sets execution dates after receiving a letter from the Attorney General asking him to do so.

83. On Friday, February 24, 2017, the Attorney General sent letters requesting Governor Hutchinson set execution dates for all plaintiffs, with the exception of Mr. Nooner.

84. On Monday, February 27, 2017, Governor Hutchinson ordered the execution schedule that is currently set.

85. Governor Hutchinson has stated in press interviews that he scheduled the executions so as to exhaust the State of Arkansas's supply of midazolam before it expires. *See* Matthew Haag & Richard Fausset, *Arkansas Rushes to Execute 8 Men in the Space of 10 Days*, N.Y. Times, Mar. 3, 2017, available at http://nyti.ms/2ln3kc4.

86. At defendants' request, the Court takes judicial notice of the publicly-available searchable execution database on the website for the Death Penalty Information Center ("DPIC"). See https://deathpenaltyinfo.org/views-executions. (Dkt. No. 29, at 41).

87. Since 1997, no state has attempted as many as eight executions within a month.

88. In 1997, Texas conducted two lethal injections on June 4, 1997, and lethal injection executions on May 28, June 2, June 3, June 11, June 16, and June 17, 1997. That amounts to eight executions by the State of Texas in a 22-day period. *See* https://deathpenaltyinfo.org/views-executions.

89. No state has conducted a double execution since 2000. *See* https://deathpenaltyinfo.org/views-executions.

90. Prior to 2000, the State of Arkansas conducted multiple executions on the same date on four occasions. *See* https://deathpenaltyinfo.org/views-executions.

91.     The only other states that have conducted multiple executions on the same date prior to 2000 are Texas, Illinois, and South Carolina.     *See* https://deathpenaltyinfo.org/views-executions.

92.     On numerous occasions, executions in Florida, Georgia, Louisiana, Mississippi, Oklahoma, South Carolina, Texas, and Virginia have been carried out within days of other executions and often on consecutive days. *See* https://deathpenaltyinfo.org/views-executions.

93.     The last time a double execution was attempted by a state, in Oklahoma in 2014, it was in Mr. Lockett's case.  *See* https://deathpenaltyinfo.org/views-executions.

94.     Mr. Lockett's execution resulted in an investigation in which the Oklahoma Department of Public Safety recommended that "executions should not be scheduled within seven calendar days of each other" and that there be sufficient time between executions for a review in which "all involved personnel [may] voice their opinions, concerns and/or recommendations in order for continuous improvement to the process." (Dkt. No. 2-2, Exhibit 4, at 28).

95.     The Missouri Supreme Court recently adopted a rule limiting the number of executions to be carried out in a one-month period.  The rule, effective January 1, 2016, read that "[t]he department of corrections shall not be required to execute more than one warrant of execution per month."  Mo. S. Ct. R. 30.30(f).

96.     Jennie Lancaster, a former Warden and Regional Director in the State of North Carolina, opines that "it would essentially be professional malpractice for only department of corrections official to attempt to stage eight executions as currently scheduled in Arkansas."  (Dkt. No. 2-2, Exhibit 15, at 6).

97.     Ms. Lancaster served as the warden during one execution of a female inmate in North Carolina, developing many of the practices used in the execution of that female inmate (Dkt.

No. 2-2, Exhibit 15, at 194; Jennie Lancaster Testimony, April 10, 2017, Vol. 1, at 93 – 136 ("Lancaster Testimony")).

98.     Ms. Lancaster, as Female Command Manager and then as Region Director, supervised the Central Prison where executions in North Carolina occurred.  From 1998 to September 2004, she supervised the Warden and administration of the death penalty in 23 executions (Dkt. No. 2-2, Exhibit 15, at 194; Lancaster Testimony).

99.     In January 2009, the Governor of North Carolina asked Ms. Lancaster to serve as Chief Operating Officer of the Department of Corrections for the State of North Carolina.  In that role, which she held for four years, there were no executions, but she was responsible for managing death row and was in a top management role involved in litigation involving potential execution protocol and death row management (Dkt. No. 2-2, Exhibit 15, at 194-95).

100.    Based on her professional experience in corrections and with executions, Ms. Lancaster said:  "To my knowledge, it is unprecedented to attempt so many lethal injections in such a short time period [as Arkansas has currently planned].  It is my opinion there is good reason for that.  Arkansas's current schedule demonstrates a total disregard for the people actually charged with carrying out these executions on behalf of the state and a misunderstanding of what the process requires." (Dkt. No. 2-2, Exhibit 15, at 195).

101.    She acknowledges the Arkansas Midazolam Protocol may differ from North Carolina's protocol (Lancaster Testimony).

102.    Based on her professional experience in corrections and with executions, Ms. Lancaster opines:  "Each and every execution is immensely stressful for everyone involved.  The level of stress is impossible to describe unless you have actually experienced it, but one analogy is the physical and mental stress a person might feel driving in a torrential rain – your whole body

is tense and you strain to focus on every detail. It's not a stress level that can be maintained for a prolonged period of time. The stress and the long hours involved in the execution process result in physical and mental fatigue after one execution. That stress and fatigue would naturally be expected to create a risk of human error. It is well known that work stress and fatigue can be causative for human error, in many work related situations. Just consider the impact of deliberately performing duties, on a timed and detailed level, that result in an execution. Multiple executions scheduled on the same day or in quick succession would magnify and prolong the stress and fatigue experienced by execution participants." (Dkt. No. 2-2, Exhibit 15, at 196; Lancaster Testimony).

103. Based on her professional experience in corrections and with executions, Ms. Lancaster opines: "The logistical issues for each execution present challenges for the leaders, such as the Director, Deputy Director, the warden and executive staff, and these multiple executions will present challenges that have never been experienced or planned for before. . . . The plan for managing, in prescribed detail, for these functions, and more, for 8 inmates is impossible for me to imagine." (Dkt. No. 2-2, Exhibit 15, at 197).

104. Based on her professional experience in corrections and with executions, Ms. Lancaster opines: "it is essential and critical that there is a formal/informal debriefing process after every execution for the staff and contract employees who are involved—including leadership. Participants must be given an opportunity to air concerns about their own ability to continue in another execution if called upon to do so. They must also be given an opportunity to assess the process itself and to correct deficiencies in the practice or protocol that may have manifested themselves. Fundamentally, there must be an immediate ability to assess the impact of an execution on the staff involved and to determine whether the process must be changed or improved moving forward. The debriefing process normally is conducted by the warden the day/days after

the execution and is the quality assurance element for all involved parties to have confidence in their administration of the death penalty. The current scheduling in Arkansas would seem to nullify this critical, timely debrief and the ability to make significant or minimal changes, and train staff as needed." (Dkt. No. 2-2, Exhibit 15, at 197-98).

105.    Former ADC Director Larry Norris worked for the ADC a total of 39 years before retiring (Testimony of Larry Norris, April 12, 2017, Vol. 3, at 703 – 753) ("Norris Testimony")).

106.    Mr. Norris, while ADC Director, was involved in every aspect and at every level of 23 executions by lethal injection (Dkt. No. 28-2, at 3).

107.    Mr. Norris has an associate's degree in nursing and a bachelor's degree in general studies (Norris Testimony).

108.    Mr. Norris worked as a phlebotomy technician when he first started with the ADC and then became an infirmary administrator with the ADC, prior to serving as an Assistant Warden, Warden, and then Director (Norris Testimony).

109.    Mr. Norris has been involved in many executions by lethal injection (Norris Testimony).

110.    Mr. Norris has never been involved in an execution using the Arkansas Midazolam Protocol or the drug midazolam (Norris Testimony).

111.    Mr. Norris has been involved in multiple executions on the same date (Dkt. No. 28-2, at 3).

112.    Mr. Norris recalls no problems or issues that resulted from conducting multiple executions on the same date (Norris Testimony).

113.    Mr. Norris has never been involved in eight executions in 10 days (Norris Testimony).

114.    Mr. Norris has never been involved in two executions in one week or two executions in two weeks (Norris Testimony).

115.    Three executions are the most executions Mr. Norris was ever involved with in one month (Norris Testimony).

116.    Mr. Norris has never been involved in conducting executions on two different dates closer than 55 days apart (Norris Testimony).

117.    Five executions are the most executions Mr. Norris ever was involved with in one calendar year (Norris Testimony).

118.    Mr. Norris takes the position that one of the most important things a correctional facility can do to get ready for an execution is to prepare for it, and that preparation is essential (Dkt. No. 28-2, at 4).

119.    Mr. Norris maintains that the ADC undergoes weeks and weeks of preparation leading up to an execution and that the process will be the same for each one, so whether there is one or more than one execution in a given week, the pre-execution preparations are the same (Dkt. No. 28-2, at 4).

120.    Mr. Norris believes that preparing for four nights of executions as opposed to eight nights is easier for the staff, both physically and emotionally (Dkt. No. 28-2, at 5).

121.    Mr. Norris, when he was involved in executions, permitted staff members to decline to participate in an execution (Norris Testimony).

122.    Mr. Norris, when he was involved in executions, conducted mandatory debriefing sessions with all staff involved in the executions (Norris Testimony).

123.     Had Governor Hutchinson sought Mr. Norris's opinion, he would have advised having four executions on two nights for the eight condemned inmates, rather than the current schedule (Dkt. No. 28-2, at 5).

### H.     Appointment Of Counsel

124.     Each plaintiff has been appointed counsel by either the United States District Court for the Eastern or Western District of Arkansas under 18 U.S.C. § 3599 or 21 U.S.C. § 848(q), the predecessor to 18 U.S.C. § 3599, which was in effect until 2006.  See *Harbison*, 556 U.S. at 190.

125.     Jeff Rosenzweig was appointed to represent plaintiff Jack Jones, Case No. 4:00mc0008-JMM, E.D. Ark., (Dkt. Nos. 1, 2).

126.     Al Schay was appointed to represent plaintiff Don Davis, until Mr. Schay died, at which time the Capital Habeas Unit of the Federal Public Defender for the Eastern District of Arkansas was appointed to represent Mr. Davis under 18 U.S.C. § 3599.  Case No. 5:01-cv-05188, W.D. Ark. (Dkt. Nos. 1, 2, 45).  Deborah Sallings was appointed as pro bono counsel without compensation.  Case No. 5:01-cv-05188, W.D. Ark. (Dkt. No. 34).

127.     Mr. Schay and the Federal Public Defendant's Office were appointed to represent Jason McGehee.  Case No. 4:02-mc-00015-SWW, E.D. Ark. (Dkt. Nos. 1, 2).

128.     Mr. Schay was appointed as counsel for plaintiff Marcel Williams.  Case No. 4:02mc0005-SMR, E.D. Ark. (Dkt. Nos. 1, 5).  Mr. Schay moved on behalf of Mr. Williams that the Federal Public Defender's Office for the Eastern District of Arkansas be appointed as co-counsel, and his motion was granted.  Case No. 4:02mc0005-SMR, E.D. Ark. (Dkt. Nos. 6, 7).

129.     Kent Gipson and William C. Odle were appointed as counsel for plaintiff Ledell Lee.  Case No. 5:01cv00377-JH, E.D. Ark. (Dkt. Nos. 26, 27).  Gary Brotherton was later substituted for Mr. Odle, and Mr. Gipson sought to withdraw (Dkt. No. 148).  Mr. Gipson's motion

was denied (Dkt. No. 155). On August 16, 2016, Lee Short was permitted to substitute in for Mr. Brotherton, who had been suspended from the Missouri bar (Dkt. No. 157).

130. Jeff Rosenzweig was appointed to represent plaintiff Stacey Johnson. Case No. 4:06mc00017GH, E.D. Ark. (Dkt. Nos. 1, 2).

131. Jeff Rosenzweig was appointed to represent plaintiff Kenneth Williams. Case No. 4:07mc00008, E.D. Ark. (Dkt. Nos. 1, 2).

132. Jennifer Merrigan, along with the Federal Public Defender's Office for the Eastern District of Arkansas, was appointed to represent plaintiff Bruce Ward. Case No. 5:03-cv-00201-BSM, E.D. Ark. (Dkt. Nos. 5, 170). The Court also granted a motion to permit Joseph Perkovich to substitute as counsel for Joe Luby (Dkt. No. 174). Ms. Merrigan and Mr. Perkovich represented two other clients who were executed earlier this year in other states, thus reducing the time they have available to work on Mr. Ward's case.

133. Mr. Rosenzweig represents plaintiffs Mr. Johnson, Mr. Jones, and Mr. Williams individually and effectively with no co-counsel.

134. Dale Adams was also appointed to represent Mr. Jones, but Mr. Adams's recent work has been limited to corresponding with Mr. Jones and the ADC regarding some of Mr. Jones's medical issues.

135. Gerald Coleman was appointed to represent Mr. Johnson, but Mr. Coleman performed little if any work on the case.

136. Mr. Rosenzweig is also co-counsel for plaintiff Jason McGehee.

137. Counsel from the Federal Public Defender's Capital Habeas Unit for the Eastern District of Arkansas represent plaintiffs Mr. Williams and Mr. McGehee and are co-counsel for Mr. Ward and Mr. Davis.

138.    Multiple death-penalty attorneys attest to the enormous responsibility placed on capital counsel once execution warrants are set (Dkt. No. 2-2, Exhibits 12, 13, 14; Wright Testimony). These responsibilities include:

a.    Counsel must litigate issues not legally available until an execution is imminent such as challenges to competency to be executed. See, e.g., *Panetti v. Quarterman*, 551 U.S. 930, 942-48 (2007) (claims regarding competency to be executed not ripe until after an execution date has been scheduled).

b.    Counsel must pursue executive clemency, which, in Arkansas, is not available to an inmate until his execution date is set. This pursuit includes extensive investigation and preparation of the petition.

c.    Counsel must pursue challenges that seek to ensure that any execution process is fair and that do not ripen until the execution process is set in place. See *Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998).

d.    Counsel must frequently consult with the client, must communicate with the client's family and friends, and must make arrangements with the client in the event he is executed.

e.    Counsel must determine whether issues disposed of in earlier proceedings may be revisited due to subsequent developments in the law.

139.    The legal proceedings in death-penalty cases are lengthy and complex (Wright Testimony).

140.    Representation of inmates under an execution warrant takes substantial time (Wright Testimony).

141.    Representation of a client under an execution warrant also takes substantial emotional resources (Wright Testimony).

142.    Representation in capital cases requires establishing a relationship of trust with the client (Wright Testimony).

143.    Mr. Johnson, Mr. Lee, Marcel Williams, Mr. McGehee, and Kenneth Williams are all seeking or have sought executive clemency.

144.     During the process involved in representing plaintiffs, Mr. Rosenzweig has been responsible for preparing two clemency applications, one for Mr. Johnson and one for Kenneth Williams, and preparing for two clemency hearings, along with securing witnesses, paperwork, and the like, within a span of less than two weeks and on very short notice.

145.     During the process involved in representing plaintiffs, the Federal Public Defender's Capital Habeas Unit lawyers are responsible for preparing two clemency applications, one for Marcel Williams and one for Jason McGehee, and preparing for two day-long clemency hearings, along with securing witnesses, paperwork, and the like, within the span of less than a week and on very short notice.

146.     Plaintiffs were given 17 days at most to file their clemency applications. Some were given only eight days. Mr. Johnson and Mr. Lee had 10 days; Marcel Williams had 15 days, Mr. McGehee and Kenneth Williams had 17 days.

147.     Lawrence J. Fox, who is a practicing lawyer, lecturer on professional responsibility at Yale Law School, and author and co-author, takes the position that plaintiffs' counsel are being asked to violate four different rules of the Arkansas Rules of Professional Conduct (Testimony of Lawrence Fox, April 11, 2017, Vol. 2, at 432 – 494 ("Fox Testimony"); Plaintiff's Hearing Exhibit 4).

148.     The Arkansas Supreme Court adopted the Arkansas Rules of Professional Conduct.

149.     Mr. Fox maintains that plaintiffs' counsel are being asked to violate Rule 1.1 regarding competence, Rule 1.3 regarding diligence, Rule 1.7 regarding conflicts of interest, and Rule 1.16, which requires that, if a lawyer's continuing representation would violate these rules, a lawyer shall not proceed with the matter (Fox Testimony).

150.     Although Mr. Fox participated in the American Bar Association's Death Penalty Representation Project, he recognizes that the American Bar Association's Guidelines are just guidelines (Fox Testimony).

151.     The American Bar Association sent a letter to Governor Hutchinson, dated April 11, 2017, voicing concern regarding the execution schedule's impact on the work of counsel (Plaintiffs' Hearing Exhibit 35).

### I.     Past Practices Regarding Counsel At Executions In Arkansas

152.     Historically, in Arkansas, according to plaintiffs' counsel who were counsel for several inmates previously executed by the State of Arkansas, Director Kelley's predecessors in office have permitted multiple attorneys to view executions (Kelley Testimony, Vol. 4).

153.     Former ADC Director Larry Norris could not recall his practice in regard to how many attorneys were permitted to view executions (Norris Testimony).

154.     Plaintiffs' counsel sought additional information about whether each plaintiff's attorneys would be able to witness their client's execution and whether they would have access to a phone during the execution (Dkt. No. 2-2, Exhibit 8).

155.     On March 16, 2017, Director Kelley informed plaintiffs' counsel that, if a plaintiff has more than one attorney, only one attorney will be allowed to witness the execution (Dkt. No. 2-2, Exhibit 9).

156.     Director Kelley's counsel informed plaintiffs' counsel that a plaintiff's attorney will not have access to a telephone during the execution if he or she chooses to view the execution (Dkt. No. 2-2, Exhibit 10).  Further, an "attorney will not be allowed to leave and then return to the viewing area.  No phone access in the viewing area."  (*Id.*)

157.     Director Kelley's counsel specifically stated:

Next, we confirm that legal counsel for the inmate is permitted, at counsel's option, to be present in the viewing area during the execution process itself. You are correct that such counsel will not be excluded due to any applicable witness limit. If the inmate has multiple legal counsel, only one will be allowed to be in the viewing area.

With respect to electronic communication devices (cell phones, tablets, laptops), you will not be allowed to bring cell phones or tablets inside the prison facility. You may bring a lap top computer into the facility so long as the device is not equipped with photography, video, or audio recording capabilities. The use of the lap top will be limited to two areas of the facility, the deputy warden's office (where a phone line and fax will be available) and the general visitation area. You will not be permitted to take a lap top to the holding cell area nor the viewing area. You can leave it in the deputy warden's office.

However, the ADC has made arrangements to provide legal counsel with the opportunity to communicate with other counsel and the courts. While at the holding cell area, legal counsel will have access to one of two phones for outbound calls. If counsel decides to return to the deputy warden's office, rather than proceeding to the viewing area, there will be two phone lines . . . for inbound or outbound calls. There will also be a fax machine . . . in that office available to counsel. Counsel may also use a lap top there. Outbound lines will also be available in the general visitation, but no fax.

(Dkt. No. 2-2, at 149-50).

158. Director Kelley's counsel refused to produce the "ADC's Execution Procedures Administrative Directive[,]" asserting that it is confidential and exempt from disclosure (Dkt. No. 2-2, at 150).

159. Director Kelley's counsel has offered that plaintiffs counsel's "other staff assigned to monitor communications with the courts . . . can have real time communications with

representatives of the Governor's Office, Attorney General's Office, and the ADC" (Dkt. No. 2-2, Exhibit 10, at 151).

160.     Plaintiffs' counsel have confirmed, as officers of the Court, that they are not seeking to record the executions.

161.     Director Kelley's predecessor provided plaintiffs a more complete version of the ADC's execution procedures, AD 09-28, which became effective on May 22, 2008 (Dkt. No. 2-2, Exhibit 11).

162.     AD 08-28 states specifically that "[c]ounsel for the inmate" may view the execution as one of no more than 30 persons who may witness the execution (Dkt. No. 2-2, Exhibit 11).  AD 08-28 otherwise makes no reference to an attorney viewing or having phone access during the execution (*Id.*).

163.     Because Director Kelley has provided no later versions of the procedures, it is unknown when the viewing and telephone policies changed.

164.     Director Kelley became Director in January 2015 (Wendy Kelley Testimony, April 12, 2017, Vol. 3, at 880 – 886 ("Kelley Testimony, Vol. 3")).

165.     ADC policies do not permit witnesses to view the execution until the IV lines have been affixed to the prisoner and the drugs are ready to flow (Kelley Testimony, Vol. 4).

166.     Members of the execution team have discretion to pull the curtain during the drug flow in the event of a problem (Kelley Testimony, Vol. 4).

167.     Audio to the witness room is shut down after the inmate's last words (Kelley Testimony, Vol. 4).

168.     ADC has informed legal counsel that, at the request of the inmate, one additional legal counsel will be allowed to enter the unit no later than 4:30 p.m. on the date of the execution.

Such counsel shall be escorted directly to the Deputy Warden's office and shall remain there for the duration of his or her stay at the unit (Dkt. No. 28-1, at 14).

169.    Arkansas law prohibits anyone from making an audio or video recording of an execution.  Ark. Code Ann. § 16-90-502(e)(5)(C) (Dkt. No. 28-1, at 14).

170.    ADC claims that its policy has never allowed anyone to bring cell phones, iPads/tablets, or other media devices into the viewing room or the Cummins Unit, relying on AD-08-28 (Dkt. No. 28-1, at 14).

171.    Director Kelley takes the position that all witnesses, including the attorneys for the ADC and the media, will be required to surrender all cell phones, tablets, cameras, computers, and other recording devices at the ADC's Central Office in Pine Bluff before being transported to the Cummins Unit (Dkt. No. 28-1, at 2, 14).

172.    According to Director Kelley, two outbound phone lines will be made available at the holding cells for the use of legal counsel (Dkt. No. 28-1, at 14).

173.    Inbound and outbound phone lines and an inbound and outbound fax line will also be made available in the visitation center (Dkt. No. 28-1, at 14).

174.    According to Director Kelley, upon request, legal counsel for the inmate will be permitted to bring a laptop computer into the unit and immediately to Deputy Warden's office, with any laptop computer remaining in the Deputy Warden's office for the duration of legal counsel's stay (Dkt. No. 28-1, at 14-15).

175.    Director Kelley testified that to get from the viewing room to the phone in the Deputy Warden's office, counsel would have to be driven, and the ride would take approximately three minutes.  The visitor's center is no closer than the Deputy Warden's office (Kelley Testimony, Vol. 4).

176.    The phone in the holding cell is closer than the Deputy Warden's office, but there may be another inmate in the cell next to where counsel would use the phone (Kelley Testimony, Vol. 4).

177.    Assistant Attorney Generals will be permitted to bring cell phones into the Cummins Unit on the date and evening of the executions; those individuals are just not permitted to bring cell phones into the execution chamber (Reed Testimony).

178.    During the two-hour execution of Mr. Wood, three attorneys attended the viewing. Two were permitted to leave the viewing area during the execution and to access a phone.  An attorney was then able to convene a 30-minute hearing with a judge (Dkt. No. 2-2, Exhibit 5).

179.    The State of Arizona explicitly allows a witnessing attorney immediate access to a cell phone:  "While the attorney witness is in the witness room, a member of the Witness Escort Team shall hold one mobile phone designated by the attorney, to be made available to the attorney in exigent circumstances."  Ariz. Execution Procedures § 1.5.1.3.   The State of Arizona requires the attorney to leave the witness room while using the phone.

180.    The State of Ohio provides that "at all times after counsel enters the witness room, counsel shall have free access to the phone near the entrance door of the Death House."  Ohio Execution Procedures §VI.G.2.

181.    Director Kelley was having difficulty finding sufficient witnesses to the executions. See Jeannie Roberts, State Hunting for Volunteers to Witness April 8's Executions, Ark. Dem.-Gaz., Mar. 22, 2017, at A1 (Dkt. No. 2-2, Exhibit 26).

182.    Director Kelley has secured 12 citizen witnesses for each of the executions (Kelley Testimony, Vol. 4).

## J.    Preparations for April 2017 Executions

183.    The State of Arkansas has not executed anyone since November 29, 2005.

184.    The State of Arkansas has not carried out a double execution since September 8, 1999.

185.    Director Kelley has not presided as director over any executions (Kelley Testimony, Vol. 4).

186.    The State of Arkansas has not carried out an execution using the Arkansas Midazolam Protocol.

187.    According to Director Kelley, there is a level of stress inherently related to the preparation of and events leading up to an actual execution night (Dkt. No. 28-1, at 8).

188.    According to Director Kelley, ADC staff undergo weeks of preparation leading up to an execution night (Dkt. No. 28-1, at 8).

189.    According to Director Kelley, the IV team will be the same for each execution date, with backup people prepared and available (Kelley Testimony, Vol. 4).

190.    According to Director Kelley, all members of the IV team and backup people, as well as all others participating in the execution, will meet the relevant qualifications set out in the Arkansas Midazolam Protocol (Dkt. No. 28-1, at 9, 12).

191.    According to Director Kelley, the ADC's "necessary and medically appropriate methods" for assessing consciousness involve the application of graded stimuli that will demonstrate, if there is no response, the presence of unconsciousness.  The consciousness check starts out with simple movements like stroking an eyelash, saying the person's name, and gentle shaking.  If there is no response, ADC then escalates the degree of stimulus to the application of a very noxious stimulus such as a very hard pinch or squeeze.  The absence of response to all of the

graded stimuli will be taken by the ADC as a demonstration of the presence of unconsciousness to all stimuli. This information is not contained in the Arkansas Midazolam Protocol (Dkt. No. 28-1, at 12).

192. According to Director Kelley, two people with medical training will simultaneously closely monitor the infusion site for evidence of infiltrate, vein collapse, or other problems. One will be the executioner who will have a full view of the inmate's face and infusion site from the chemical room, separate from the execution chamber. The second will be the designee who will be in the execution chamber with the condemned inmate throughout the execution process and can switch drug flow to an alternative infusion site if necessary or to address any problem with the infusion site pursuant to the protocol. The executioner and designee will be in constant contact through headset communication devices. This information is not contained in the Arkansas Midazolam Protocol (Dkt. No. 28-1, at 12-13).

193. Dale Reed has been employed by the ADC for 43 years (Testimony of Dale Reed, April 11, 2017, Vol. 2, at 537 – 74 ("Reed Testimony")).

194. He was the Warden at the Cummins Unit from 1994 to 2003, and while there, he participated as warden in approximately 20 executions (Reed Testimony, Vol. 2).

195. He participated as Warden in several single executions in one night and multiple executions in one night. Specifically, he participated as Warden in three executions in one night in 1994, three executions in one night in 1997, and two executions in one night in 1999 (Reed Testimony, Vol. 1).

196. He recalled no problems or issues that occurred with the executions over which he presided as Warden at the Cummins Unit (Reed Testimony, Vol. 1).

197.     Mr. Reed never presided over executions scheduled seven or eight in a ten or 11-day period (Reed Testimony, Vol. 1).

198.     According to Mr. Reed, while Warden, he conferred with staff and felt that multiple executions were best for staff at that time.  When asked why, he explained that "there's a lot of serious prep time that goes into an execution.  There's really – for some people, it's about a three-week-long concentration of efforts.  And for everybody involved, there's two weeks of getting ready, meetings with staff, doing practices, getting all the things in place.  So it was – if you had spread those out, the staff would have had those increments spread out further and it would have been harder on them, more stressful than doing two in a night." (Reed Testimony, Vol. 1).

199.     When Mr. Reed was Warden, to prepare for an execution, "once the execution date was set, then [staff] would have first a meeting with all the agencies and different entities that had any part to play in it.  And then from there, [Mr. Reed] would set schedules for staff to meet with them on their particular issues.  [Staff and Mr. Reed would] have meetings, usually took the better part of a week, really, because [Mr. Reed] would schedule a certain part of the staff for a certain day and [Mr. Reed would] go through their role with regard to the execution.  And then during that two-week period, [staff and Mr. Reed would] have practice, tie-down practice twice, generally, in the two-week period, where you'd actually bring all staff together that would do the execution and actually get a staff member that's similar to the inmate in stature and go through the process so the staff could practice tying down the inmate and actually carrying out a simulated execution.  So [staff and Mr. Reed would] do that two times in two week, but usually [staff and Mr. Reed would] do probably about three sets, you know.  [Staff and Mr. Reed would] do it three times in two weeks.  So it would be about twelve times, probably, [staff and Mr. Reed] would actually go through the whole part of the process." (Reed Testimony, Vol. 1).

200.     The staff practiced with an inmate of similar stature, according to Mr. Reed, because they wanted to make sure everything was right.  Mr. Reed testified:  "We go to the cell, just like we do when an inmate's there, and walk through the whole process; the securing of him, the cuffs, the taking him into the area, strapping him down.  And that's practice.  That's what you do." (Reed Testimony, Vol. 1).

201.     When Mr. Reed was Warden, execution team members were asked to participate based on observations about how they performed and tenure (Reed Testimony).

202.     An employee could decline to participate on the execution team, even if selected to participate (Reed Testimony, Vol. 1).

203.     Mr. Reed recalls no staff member declining to participate in the 23 executions he participated in as Warden (Reed Testimony, Vol. 1).

204.     When Mr. Reed was Warden, "[w]hen an inmate was transferred [to death row at the Cummins Unit getting ready to be executed, Mr. Reed] would be there when they go there and start the actual log books that we have to start and talk to them about, just briefly about the process, which usually those guys have been around a long time, so they kind of knew a lot about the process too.  But [Mr. Reed] would tell them what's going to be happening with them there at the unit, discuss the fact that [staff] were going to meet all their needs, and if they had some needs, they just needed to let [Mr. Reed] know.  Basic thing [staff] wouldn't do is surprise them with anything.  When they come in, that's what [Mr. Reed] told them, that, you know, [all have] got to work through this together, if you will, and so there wasn't going to be any surprises.  And if, you know, they acted well, then their privileges would be easier to grant, because [staff] wanted to do everything that [they] could for them during those last days.  And if they were cooperative, then that was easier for [staff] to do that, contact visits and other things that they could get if they

weren't acting out. And then of course, [Mr. Reed] would see them every day and just make sure they got everything, checked on their mail, just have a conversation with them every day." (Reed Testimony, Vol. 1).

205.    Mr. Reed, while Warden, played no role in regard to the drugs that are used for the execution protocol (Reed Testimony, Vol. 1).

206.    The last time Mr. Reed participated in two executions in one night was in 1999, almost 18 years ago (Reed Testimony, Vol. 1).

207.    Mr. Reed was promoted by Director Kelley and now serves as Chief Deputy Director of the ADC (Reed Testimony, Vol. 1).

208.    The current Warden of the Cummins Unit is in charge with regard to practices for the upcoming executions, but Mr. Reed is his supervisor and also is involved in those practices (Reed Testimony, Vol. 1).

209.    When asked if staff would do 12 practices for each of the seven or eight condemned inmates with a guard or officer of similar stature, Mr. Reed admitted "[p]robably not since they're close together." (Reed Testimony, Vol. 1)

210.    Mr. Reed confirmed the manner in which the condemned inmate will be strapped to the gurney and restrained during the execution (Testimony of Dale Reed, April 12, 2017, Vol. 3, at 753 to 778 ("Reed Testimony, Vol. 3")).

211.    Mr. Reed received a copy of the lethal injection policy that addresses logistics of the execution shortly after the execution dates were set (Reed Testimony, Vol. 3).

212.    Mr. Reed confirmed that no one outside of the ADC, not even representatives of the Attorney General's Office or any other state agency, will be permitted to bring a cell phone into the execution chamber (Reed Testimony, Vol. 3).

213.     Mr. Reed confirmed that, although post-execution debriefings would be conducted with staff, those debriefings in his experience last at most two hours and could take less time. Those debriefings, under the circumstances of this schedule, would not occur after the night's first execution but instead would only occur the morning after the night's second (Reed Testimony, Vol. 3).

214.     As of March 7, 2017, Mr. Reed had not seen the current ADC execution policy (Reed Testimony, Vol. 3).

215.     According to Mr. Reed, the ADC execution policy does not change after each execution (Reed Testimony, Vol. 3).

216.     Mr. Reed confirmed that, if there are issues that arise during an execution, the ADC staff can make adjustments to the process to make it smoother or more efficient (Reed Testimony, Vol. 3).

217.     Mr. Reed does not hold the opinion that the current execution schedule presents extra stress or will create extra stress that will lead to error at the executions (Reed Testimony, Vol. 3).

218.     Rory Griffin has been employed by the ADC since 2009 when he became the Administrator of Medical and Dental Services (Testimony of Rory Griffin, April 12, 2017, Vol. 3, at 779 – 874 ("Griffin Testimony")).

219.     Mr. Griffin is a licensed LPN, has a bachelor of science degree in organizational management, and has a master's degree in healthcare administration (Griffin Testimony).

220.     Mr. Griffin began his career prior to 2009 working for a contract healthcare provider as an LPN at the ADC's Varner Unit, then as a regional state-wide ombudsman, then as

the health services administrator or infirmary manager at the ADC's Tucker Unit, and then as infirmary manager at the Cummins Unit (Griffin Testimony).

221.    For various periods, but not consistently, throughout his career Mr. Griffin has participated directly in patient care (Griffin Testimony).

222.    Executions took place at the Cummins Unit while Mr. Griffin worked there, but he was still an employee of the contract healthprovider, not ADC, so he did not participate in the executions (Griffin Testimony).

223.    Since 2013, Mr. Griffin has served as Deputy Director of Healthcare and Programs at the ADC as an ADC employee (Griffin Testimony).

224.    Mr. Griffin will participate in the upcoming scheduled executions (Griffin Testimony).

225.    Where there is a reference to "Deputy Director" in the Arkansas Midazolam Protocol, those references are to Mr. Griffin (Griffin Testimony).  Mr. Griffin has several responsibilities under the protocol and can delegate certain responsibilities under the protocol.  He testified at length about what he will be responsible for and what he will delegate under the protocol.

226.    Mr. Griffin has never participated in an execution before (Griffin Testimony).

227.    Mr. Griffin has been participating in practices for the scheduled executions (Griffin Testimony).

228.    Mr. Griffin confirmed that there will be no monitors, such as cardiac monitors, hooked up to the inmate during the execution (Griffin Testimony).

229.     Director Kelley later testified that Mr. Griffin's designee will be using a "pulse ox" monitor or indicator that will measure heart rate, pulse, and oxygen level, contrary to what Mr. Griffin indicated (Kelley Testimony, Vol. 4).

230.     The Arkansas Midazolam Protocol gives Mr. Griffin no guidance on when to mix the execution drugs for the first or second scheduled execution of the night (Griffin Testimony). He anticipates that he will mix those drugs when Director Kelley tells him to do so.

231.     Mr. Griffin testified the Director has the ability to call off the IV Team's attempt to place the IV lines in the condemned inmate (Griffin Testimony).

232.     Mr. Griffin will bring a handheld ultrasound machine to the executions in the event it is needed to place a central line (Griffin Testimony).

233.     Mr. Griffin is designating the person to perform the consciousness check and has discussed with Director Kelley the duties of that person during the check (Griffin Testimony).

234.     Mr. Griffin described the steps in the consciousness check as calling the condemned inmate's name, doing an eyelash reflex, perhaps shake the individual and call their name again in a louder voice, perform a corneal reflex, and then move onto something like a really good firm Trapezius pinch (Griffin Testimony).

235.     Mr. Griffin and Director Kelley have discussed purposeful and nonpurposeful movement, but Mr. Griffin admits that he is not an expert in that area (Griffin Testimony).

236.     Mr. Griffin confirmed that the ADC does not have in its possession any drugs to reverse the effects of any of the three drugs involved in the Arkansas Midazolam Protocol (Griffin Testimony).

237.    Mr. Griffin is aware of no plans to reverse the effects of the midazolam if the condemned inmate remains conscious after the midazolam called for under the Arkansas Midazolam Protocol is injected (Griffin Testimony).

238.    The practice sessions have not included rehearsing seeking medical treatment for the condemned inmate during the execution, but Mr. Griffin said that it is a requirement that, if medical staff is called, they must respond anywhere in the Cummins Unit within four minutes. The execution chamber is about a minute and a half walk to the infirmary in the Cummins Unit. However, Mr. Griffin is not aware whether that medical staff would be called in to assist under those circumstances (Griffin Testimony).

239.    Mr. Griffin participated with others, including Director Kelley, in revising the Arkansas Midazolam Protocol sometime in 2015 (Griffin Testimony).

240.    Mr. Griffin did not recommend the ADC consider using a barbiturate in the execution protocol in 2015, even though the Arkansas Legislature approved that in Ark. Code Ann. § 5-4-617, because the ADC had midazolam in its possession and the United States Supreme Court ruled that the Oklahoma midazolam protocol was not unconstitutional.

241.    As a result, Mr. Griffin made no efforts at that time in 2015 and has made no efforts since that time in 2015 to obtain a barbiturate (Griffin Testimony).

### K.    Attempts To Obtain Protocol Drugs

242.    The 2015 version of the MEA took effect on April 6, 2015 (Dkt. No. 28-1, at 2).

243.    The ADC adopted its current lethal injection protocol on August 6, 2015 (Dkt. No. 28-1, at 2).

244.    Mr. Griffin testified that only two people in the ADC are responsible for obtaining execution drugs – Mr. Griffin and Director Kelley (Griffin Testimony).

245. Between April 6, 2015, and August 6, 2015, Director Kelley attempted to obtain a barbiturate for the ADC to use in carrying out capital punishment by lethal injection, but her efforts were unsuccessful (Dkt. No. 28-1, at 2).

246. According to Director Kelley, the supplier who sold to the ADC its initial supply of FDA-approved drugs for use in executions only agreed to sell the drugs to the ADC for use in executions after receiving a copy of Act 1096 of 2015 and confirming that the ADC is required by law to keep its identity confidential, unless ordered to disclose the information in litigation (Dkt. No. 28-1, at 2).

247. According to Director Kelley, that supplier has made clear to her that it will not supply any additional drugs for the ADC to use in executions (Dkt. No. 28-1, at 2).

248. Director Kelley takes the position that, despite the confidentiality provision, it is still very difficult to find a supplier willing to sell drugs to the ADC for use in lethal injection executions (Dkt. No. 28-1, at 3).

249. The ADC's supply of midazolam will expire at the end of April 2017 (Dkt. No. 28-1, at 3).

250. Director Kelley is unaware of any supplier or manufacturer of midazolam that will sell to the ADC for use in executions (Dkt. No. 28-1, at 3).

251. Mr. Griffin signed an affidavit in October 2015 regarding efforts to contact vendors to acquire drugs for executions for the ADC (Griffin Testimony, Plaintiffs' Confidential Hearing Exhibit D, at 179-84).[3]

---

[3] Although this document appears in Confidential Hearing Exhibit D, all counsel agreed that Mr. Griffin's affidavit was publicly filed in another case.

252.     Mr. Griffin submitted this affidavit as a result of the Arkansas state court litigation (Griffin Testimony).

253.     Mr. Griffin was not certain if some of the entities he contacted and reported in the affidavit were sellers or manufacturers of the drugs used in executions (Griffin Testimony).

254.     Mr. Griffin has not talked to any of the companies listed in that affidavit since October 13, 2015 (Griffin Testimony).

255.     In fact, the affidavit was prepared for litigation, so Mr. Griffin testified that someone from the Arkansas Attorney General's Office gave to him a list of the manufacturers and the specific drugs for Mr. Griffin to check to seek if the ADC could purchase.  The list had phone numbers for each of the companies.  He does not recall if the list provided to him also included names of contacts at the companies.  He did not hear back from or follow up with any company or individual identified in the affidavit (Griffin Testimony).

256.     Mr. Griffin confirmed that his understanding is the manufacturers of vecuronium bromide and potassium chloride do not want to sell their drugs to prisons for the purpose of executions (Griffin Testimony).

257.     Mr. Griffin was able to obtain vecuronium bromide for use in the scheduled executions (Griffin Testimony).

258.     He did not acquire vecuronium bromide from the manufacturer (Griffin Testimony).

259.     His understanding is that the distributor who sold the vecuronium bromide to the ADC likely had an arrangement or agreement with the manufacturer not to sell it for use in executions (Griffin Testimony).

260.    Since October 2015, Mr. Griffin called only one drug supplier to obtain the vecuronium bromide, and he only had to make that one phone call to obtain it (Griffin Testimony).

261.    The ADC paid for the vecuronium bromide (Griffin Testimony).

262.    Mr. Griffin understands that the seller of the vecuronium bromide may have asked for it back after the sale, but Mr. Griffin did not participate in all of those discussions (Griffin Testimony).

263.    The ADC did not give back the vecuronium bromide (Griffin Testimony).

264.    Mr. Griffin has not talked to any compounding pharmacies about providing execution drugs to the ADC (Griffin Testimony).

265.    Mr. Griffin testified that he has the drugs necessary for the ADC to carry out the executions, so he has made no attempt to get other drugs (Griffin Testimony).

266.    The Court provides its findings pertaining to the risk of harm of the Arkansas Midazolam Protocol and the availability of alternative methods of execution later in this Order and incorporates those factual findings here by reference (*see* pages 53-85).  To the extent the Eighth Circuit Court of Appeals agrees with the Sixth Circuit Court of Appeals that, under *Glossip*, "the determination about whether midazolam entails a substantial risk of severe pain is a finding of fact," then the Court incorporates its analysis of midazolam and alternatives as factual findings, rather than conclusions of law.  *See In re Ohio Execution Protocol*, No. 17-3076, 2017 WL 1279282, at *6 (6th Cir. Apr. 6, 2017) ("[T]he determination about whether midazolam entails a substantial risk of severe pain is a finding of fact because clear error is the standard of review applicable to findings of fact, not legal conclusions.").

267.    The Court provides its findings pertaining to the right to counsel and access to the courts claims later in this Order when it examines Director Kelley's viewing policies and incorporates those factual findings here by reference (*see* pages 87-91).

## IV.    Legal Standard For A Preliminary Injunction

When determining whether to grant a motion for preliminary injunction, this Court considers:  (1) the threat of irreparable harm to the movant; (2) the movant's likelihood of success on the merits; (3) the balance between the harm to the movant and the injury that granting an injunction would cause other interested parties; and (4) the public interest.  *Kroupa v. Nielsen*, 731 F.3d 813, 818 (8th Cir. 2013) (quoting *Dataphase Sys. Inc. v. CL Sys.,* 640 F.2d 109, 114 (8th Cir. 1981)).  In cases where condemned inmates seek "time to challenge the manner in which the State plans to execute them[,]" plaintiffs must show "a significant possibility of success on the merits." *Jones v. Hobbs*, 604 F.3d 580, 581 (8th Cir. 2010) (internal quotation marks omitted) (quoting *Hill v. McDonough,* 547 U.S. 573, 584 (2006)); *see also id.*, at 582 (Melloy, J., dissenting) ("I read the majority opinion in this case to reject the State's argument that the heightened standard of proof articulated in *Planned Parenthood v. Rounds,* 530 F.3d 724 (8th Cir.2008), applies to stays of execution.  Rather, the standard set forth in *Hill v. McDonough,* 547 U.S. 573, 584, 126 S.Ct. 2096, 165 L.Ed.2d 44 (2006), applies."); *Johnson v. Lombardi*, 809 F.3d 388, 390 (8th Cir.), *cert. denied*, 136 S. Ct. 601 (2015) (same).  Preliminary injunctive relief is an extraordinary remedy, and the party seeking such relief bears the burden of establishing the four *Dataphase* factors.  *Watkins Inc. v. Lewis,* 346 F.3d 841, 844 (8th Cir. 2003).  The focus is on "whether the balance of the equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined."  *Id*.

### V.     Delay In Bringing Suit

Before granting a request for stay of an execution, a "district court must consider not only the likelihood of success on the merits and the relative harms to the parties, but also the extent to which the inmate has delayed unnecessarily in bringing the claim, which counsels against the entry of an equitable remedy."  *Nooner v. Norris*, 491 F.3d 804, 808 (8th Cir. 2007) (quoting *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004) (internal quotation marks omitted).  The Court finds that plaintiffs have not delayed unnecessarily in bringing this action.

The Arkansas legislature passed an amended version of the MEA in 2015 (Dkt. No. 29, at 5).  *See* Ark. Code Ann. § 5-4-617 (2015).  In amending the statute, the legislature provided that the ADC could use a lethal injection protocol consisting of midazolam, vecuronium bromide, and potassium chloride.  Ark. Code Ann. § 5-4-617(c)(2).

As defendants state in their response to plaintiffs' motion for a preliminary injunction, "[o]n April 6, 2015, *almost immediately after Act 1096 became law*, the Prisoners filed suit attacking its constitutionality in the Circuit Court of Pulaski County, Arkansas" (Dkt. No. 29, at 7) (emphasis added).  Plaintiffs nonsuited the first case after defendants removed it to federal court (*Id.*).  Defendants characterize this dismissal as plaintiffs' first "bite at the apple challenging the State's current lethal-injection protocol" (Dkt. No. 29, at 2).

"*The same day* that they nonsuited the 2015 federal action, the Prisoners filed an 'Amended Complaint' in Pulaski County Circuit Court . . . raising only state-law challenges to Act 1096" (*Id.*) (emphasis added).  Defendants filed a motion to dismiss plaintiffs' operative complaint because it was filed under the same state case number, Case No. 60CV-15-1400, that defendants removed to federal court.  *See* Motion to Dismiss Plaintiffs' Second Amended Complaint, *Williams, et al. v. Kelley, et al.*, Case No. 60CV-15-1400 (CO6DO5, May 19, 2015).  "[O]ut of an

abundance of caution," plaintiffs filed a new action in the Pulaski County Circuit Court under a new case number, Case No. 60CV-15-2921, and argued that the court should deny defendants' motion to dismiss as moot. *See* Response to Motion to Dismiss, *Williams, et al. v. Kelley, et al.*, Case No. 60CV-15-1400 (CO6DO5, June 30, 2015). In an Order prepared by counsel for the ADC and agreed to by counsel for plaintiffs, the Pulaski County Circuit Court dismissed Case No. 60CV-15-1400, which was the state case that defendants removed to federal court, without prejudice, "[b]ased on the parties' stipulation and submissions" (Dkt. No. 28-17). In their response to plaintiffs' motion for a preliminary injunction, defendants characterize this dismissal as "the second time the Prisoners' constitutional claims against Act 1096 were dismissed" (Dkt. No. 29, at 8).

Plaintiffs' "second" lawsuit, which plaintiffs filed under Case No. 60CV-15-2921 in Pulaski County Circuit Court, challenged the constitutionality of the 2015 version of the MEA under Arkansas law (*Id.*). Plaintiffs filed an amended complaint on September 28, 2015, "to include new claims challenging the constitutionality of the ADC's Lethal Injection Procedure" (*Id.*, at 9). In doing so, plaintiffs were diligent in challenging the constitutionality of midazolam, as the ADC revised the protocol to include the use of midazolam on August 6, 2015 (Dkt. No. 2-2, at 66; Dkt. No. 29, at 25). The state took an interlocutory appeal of the Pulaski County Circuit Court's denial of the state's motions based on sovereign immunity. On July 21, 2016, the Arkansas Supreme Court reversed the Pulaski County Circuit Court, finding that plaintiffs failed to plead sufficient facts in their amended complaint to establish a violation of the Arkansas Constitution, meaning defendants were entitled to sovereign immunity. *Kelley v. Johnson*, 496 S.W.3d 346, 360

(Ark. 2016), *reh'g denied* (July 21, 2016), *cert. denied*, 137 S. Ct. 1067 (2017).4  Defendants

characterize this dismissal as plaintiffs' third "bite at the apple challenging the State's current

lethal-injection protocol" (Dkt. No. 29, at 2).

The Arkansas Supreme Court denied plaintiffs' request for rehearing but agreed "to stay

the mandate while the Prisoners sought a writ of *certiorari* from the United States Supreme Court"

(*Id.*, at 14).  The United States Supreme Court denied plaintiffs' petition for a writ of *certiorari* on

February 21, 2017.  *See Johnson v. Kelley*, 137 S. Ct. 1067 (2017).  On February 24, 2017, the

Arkansas Supreme Court issued the mandate of its decision in *Kelley v. Johnson* (Dkt. No. 28-20).

On February 27, 2017, Governor Hutchinson set the execution dates at issue (Dkt. No. 4, at 4).

Plaintiffs filed their 534-page complaint along with a motion for preliminary injunction in

this action on March 27, 2017.  Plaintiffs base three of the seven claims in their complaint on the

execution schedule set by Governor Hutchinson on February 27, 2017.  Plaintiffs base two of their

claims on the state's intended use of midazolam, which plaintiffs have been contesting—without

ever receiving a hearing on the merits—since the days after the Arkansas legislature passed the

2015 version of the MEA.  For these reasons, the Court finds that plaintiffs have not "delayed

unnecessarily" in bringing this action.  *Nooner*, 491 F.3d at 808.

## VI.    Conclusions Of Law

Plaintiffs bring seven claims in this action and move for a preliminary injunction based on

each of their claims.  By previous Order, the Court granted in part and denied in part defendants'

motion to dismiss plaintiffs' claims (Dkt. No 53).  The following claims remain pending:

---

4  For the reasons provided in its Order on defendants' motion to dismiss, the Court finds
that the Arkansas Supreme Court's decision in *Kelley v. Johnson* does not preclude this action
(Dkt. No. 53).

1.      The compressed execution schedule violates the Eighth Amendment because it violates our nation's "evolving standards of decency."  This was one of two claims made by plaintiffs in Claim II of the complaint.

2.      The use of midazolam as an execution drug violates the Eighth Amendment.

3.      The use of midazolam, the compressed execution schedule, and the ADC's other execution policies combine to violate the Eighth Amendment.

4.      The ADC's execution policies violate plaintiffs' right of access to the courts under the First Amendment and Due Process Clause.

5.      The ADC's execution policies violate plaintiffs' right to counsel under 19 U.S.C. § 3599.

### A.      Eighth Amendment Claims

Plaintiffs have three remaining claims under the Eighth Amendment.  The Court separates these claims into two categories:  one evolving standards of decency claim and two method of execution claims.

### 1.      Significant Possibility Of Success On the Merits As To Evolving Standards Of Decency Claim

The Court finds that plaintiffs have not established that there is a significant possibility that they will succeed on their evolving standards of decency claim.  As the Court noted in its Order on defendants' motion to dismiss, the Supreme Court "affirmed the necessity of referring to 'the evolving standards of decency that mark the progress of a maturing society' to determine which punishments are so disproportionate as to be cruel and unusual." *Roper v. Simmons*, 543 U.S. 551, 561 (2005) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–101 (1958) (plurality opinion)).  However, like the United States District Court for the Southern District of Ohio recently determined in a method of execution case, this Court determines that neither the Supreme Court nor the Eighth

Circuit Court of Appeals is prepared to recognize an evolving standards of decency claim in this context, meaning plaintiffs are unlikely to prevail on the merits of this claim. *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2017 WL 378690, at *6 (S.D. Ohio Jan. 26, 2017), *aff'd sub nom. In re Ohio Execution Protocol*, No. 17-3076, 2017 WL 1279282 (6th Cir. Apr. 6, 2017). Therefore, to the extent that plaintiffs move for a preliminary injunction on this claim, the Court denies their motion.[5]

### 2. Significant Possibility Of Success On the Merits As Method Of Execution Claim[6]

Challenges to a state's method of execution under the Eighth Amendment are analyzed under a two-prong test established by the Supreme Court in *Baze v. Rees*, 553 U.S. 35 (2008), and *Glossip v. Gross*, 135 S. Ct. 2726 (2015). Plaintiffs have the burden of proving that "the State's lethal injection protocol creates a demonstrated risk of severe pain" and "the risk is substantial when compared to the known and available alternatives." *Glossip*, 135 S. Ct. at 2737 (citing *Baze*, 553 U.S. at 61).

---

[5] In cases where the Supreme Court has evaluated an Eighth Amendment claim using our nation's evolving standards of decency, the Court has considered certain facts in determining whether a previously constitutional practice is unconstitutional. *See Roper*, 543 U.S. at 563 (considering "objective indicia of society's standards" such as "legislative enactments and state practice" in determining whether it is cruel and unusual to execute juvenile offenders). Therefore, the Court evaluated plaintiffs evolving standards of decency claim at this stage of the proceedings, rather than at the motion to dismiss stage. This mirrors the procedural posture taken by the United States District Court for the Southern District of Ohio.

[6] As the Court previously stated, if the Eighth Circuit Court of Appeals agrees with the Sixth Circuit Court of Appeals that, under *Glossip*, "the determination about whether midazolam entails a substantial risk of severe pain is a finding of fact," then the Court incorporates its analysis of midazolam and alternatives as factual findings, rather than conclusions of law. *In re Ohio Execution Protocol*, 2017 WL 1279282, at *6.

### a.    Demonstrated Risk Of Severe Pain

Under the first prong of *Baze/Glossip*, at this stage plaintiffs must establish a significant possibility that the defendants' chosen method of execution exposes them to a demonstrated risk of severe pain.  As "[s]ome risk of pain is inherent in any method of execution—no matter how humane— . . . the Constitution does not demand the avoidance of all risk of pain in carrying out executions."  *Baze*, 553 U.S. at 47.  Plaintiffs must show that "the method presents a risk that is '*sure or very likely* to cause serious illness and needless suffering, and give rise to 'sufficiently *imminent* dangers.'"  *Glossip*, 135 S. Ct. at 2737 (citing *Baze*, 553 U.S. at 50).  Stated differently, "to prevail on such a claim there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm' that prevents prison officials from pleading that they were 'subjectively blameless for purposes of the Eighth Amendment.'"  *Id.* (quoting *Baze*, 553 U.S. at 50).

In *Baze*, the Supreme Court elaborated on the meaning of an "objectively intolerable" risk.  The Court cautioned that the mere fact that "an execution method may result in pain, either by accident or as an inescapable consequence of death, does not establish the sort of 'objectively intolerable risk of harm' that qualifies as cruel and unusual."  *Id.*  The Court then compared two circumstances to explain what constitutes an objectively intolerable risk.  The Court referred to its decision in *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459 (1947), where "a plurality of the Court upheld a second attempt at executing a prisoner by electrocution after a mechanical malfunction had interfered with the first attempt."  *Id.*  The *Baze* Court noted that the state's second attempt at executing the prisoner in *Resweber* did not violate the Eighth Amendment because the first failed attempt at executing the prisoner was "'an accident, with no suggestion of malevolence[.]'"  *Id.* (quoting *Resweber,* 329 U.S. at 463).  The *Baze* Court remarked that "an isolated mishap alone does not give rise to an Eighth Amendment violation, precisely because such

an event, while regrettable, does not suggest cruelty, or that the procedure at issue gives rise to a 'substantial risk of serious harm.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)). By comparison, the *Baze* Court explained that if the state's subsequent attempt to execute the prisoner had followed "'a series of abortive attempts at electrocution[,]" then the subsequent execution "would demonstrate an 'objectively intolerable risk of harm' that officials may not ignore." *Id.* (quoting *Resweber,* 329 U.S. at 471) (Frankfurter, J., concurring). Stated differently, if the state attempted to execute a prisoner using a method that had repeatedly failed, that would suggest that the state was acting wantonly or that the procedure at issue presented a "substantial risk of serious harm." *Id.* The preliminary injunction posture of this case requires plaintiffs to demonstrate a substantial likelihood that they can establish both that Arkansas's Midazolam Protocol creates a demonstrated risk of severe pain and that the risk is substantial when compared to the known and available alternatives. *Glossip v. Gross*, 135 S. Ct. 2726, 2737, 192 L. Ed. 2d 761, *reh'g denied*, 136 S. Ct. 20, 192 L. Ed. 2d 990 (2015). The Court determines that, based on plaintiffs' theory of this case and the proof they presented at this stage, they have met their burden.

The Court finds that there is a significant possibility that plaintiffs will succeed in showing that the use of midazolam in the ADC's current lethal injection protocol qualifies as an objectively intolerable risk that plaintiffs will suffer severe pain. That risk is exacerbated when considering the fact that the state has scheduled eight executions over 11 days, despite the fact that the state has not executed an inmate since 2005. Furthermore, the ADC's execution protocol and policies fail to contain adequate safeguards that mitigate some of the risk presented by using midazolam and trying to execute that many inmates in such a short period of time.

The three drugs in the Arkansas Midazolam Protocol serve different purposes. It is fairly well settled that the second drug, vecuronium bromide, paralyzes the inmate's diaphragm and

prevents breathing. Likewise, it is fairly well settled that the third drug, potassium chloride, stops the inmate's heart. The first drug, midazolam, is intended to anesthetize the inmate from the pain of the second and third drugs. Plaintiffs claim and present proof to support their claim that the pain of the second and third drugs in the Arkansas Midazolam Protocol, absent a sufficient state of sedation or general anesthesia, is severe. The Court concludes, for reasons explained later in its analysis, that there is a significant possibility that plaintiffs will succeed in a showing that, if midazolam does not work as intended, plaintiffs will suffer severe pain. Therefore, the larger question before the Court is whether there is an "objectively intolerable risk" that midazolam will not anesthetize plaintiffs. Although this is a determination made at the preliminary injunction stage, the Court concludes that there is a significant possibility that plaintiffs will succeed on the merits of this argument.

This Court heard testimony from several witnesses regarding the science of the Arkansas Midazolam Protocol. The Court emphasizes that, in explaining why it reaches this determination, it is at an early stage of the litigation, with the Court having received much evidence in the last four days and then having filtered that evidence, considerable amounts of which involved scientific principles, to convert it into the Court's layman's terms to prepare this Order.

The parties agree that neither plaintiffs' nor defendants' witnesses are aware of any scientific studies conducted in humans regarding the effects of a 500 mg dose or a 1,000 mg of midazolam administered to a person or the effects of the Arkansas Midazolam Protocol on a condemned inmate. If the parties are correct in regard to the available science, there is very little published regarding scientific study in humans of the effects of midazolam on humans at certain doses. One of these published studies was admitted into evidence as Defendants' Exhibit 12 (Dkt. No. 28-12). The study involved 26 people, and after hearing much witness testimony regarding it

and reviewing the actual article, the Court concludes the results of the study are mixed in terms of supporting either side's theory of this case.

For example, the article purports to use electroencephalogram bispectral analysis to predict the depth of midazola-induced sedation (Dkt. No. 28-12). Researchers and clinicians developed a way to measure the depth of general anesthesia using the technique of electroencephalograms ("EEG") (Dkt. No. 2-2, Exhibit 16, at 231). The EEG recordings are processed on a computer with a method called bispectral analysis or BIS. BIS gives a single number on a scale from 10, which indicates completely awake and alert, to 0, which indicates coma and EEG burst suppression (Dkt. No. 2-2, Exhibit 16, at 231). According to plaintiffs' witness Dr. Stevens, studies have verified that a BIS value of 40 to 60 is considered to reflect the state of general anesthesia (Dkt. No. 2-2, Exhibit 16, at 231; Testimony of Dr. Stevens, April 11, 2017, Vol. 2 ("Stevens Testimony, Vol. 2")). The results of this human study collected data for BIS scores in a range, with many readings of BIS scores of 69 and 66 (Dkt. No. 28-2; Fig. I). There appear to be very few readings plotted below a BIS score of 60 (Dkt. No. 28-2; Fig. I; Testimony of Dr. Stevens, April 13, 2017, Vol. 4 ("Stevens Testimony, Vol. 4")). Plaintiffs' witness Dr. Stevens takes the position that studies have verified that a BIS value of 40 to 60 is considered to reflect the state of General Anesthesia (Dkt. No. 2-2, Exhibit 16, at 231). Defendants' witness Dr. Buffington stated in his testimony that the "industry definition of general anesthesia" is a BIS score of 60 (Testimony of Dr. Bufftington, Vol. 3 ("Buffington Testimony")). Plaintiffs' witness Dr. Stevens also opines that clinical studies that show a ceiling effect of midazolam noted that increasing doses of IV midazolam did not produce greater pharmacological effects in lowering BIS values (Dkt. No. 2-2, Exhibit 16, at 232).

The Court could provide a second example involving another article on midazolam and BIS that also involved hypoxia (Defendants' Hearing Exhibit 26; Stevens Testimony, Vol. 4). After hearing much witness testimony regarding it and reviewing this second article, the Court concludes again that the results of the study are mixed in terms of supporting either side's theory of this case. These are two articles among many in this record, and two articles among many this Court has reviewed and heard testimony regarding in reaching its determination.

As a result of the lack of scientific studies conducted in humans, witnesses on both sides testify about the possible effects of midazolam at a 500 mg or 1,000 mg dose administered to humans by extrapolating from animal and *in vitro* studies. During this presentation of evidence, defendants mounted an attack on plaintiffs' expert Dr. Stevens for his reliance on animal and *in vitro* studies of midazolam, especially in regard to what the parties refer to as the "ceiling effect" of the drug. Yet when defendants' experts took the stand, they conceded that aside from a limited number of human studies, their own testimony about midazolam was based in part on animal studies. When asked by his counsel whether midazolam can be used to induce general anesthesia, defendants' witness Dr. Antognini tesified: "Yes, it can, and we'll get to that point. That's an important thing that we need to talk about. I just want to say, though, that there is at least one animal study showing that midazolam can be used as a general anesthetic or has achieved general anesthesia." (Dr. Antognini Testimony, April 13, 2017, Vol. 4 ("Antognini Testimony")). Defendants' witness Dr. Antognini's reliance on animal studies while defense counsel simultaneously challenged plaintiffs' witness Dr. Steven's reliance on animal and *in vitro* studies seems inconsistent. This inconsistency went largely unexplained.

These witnesses are testifying regarding the possible effects of midazolam based on the chemical properties and mechanisms of midazolam as compared to other drugs. In this regard, the

witnesses address the potential for a ceiling effect of midazolam. Plaintiffs' witness Dr. Stevens testified that midazolam binds on a "GABA$_A$ receptor." (Stevens Testimony, Vol. 2). When bound on the receptor, midazolam depresses neural activity. However, Dr. Stevens testified that midazolam only depresses neural activity when gamma-aminobutyric acid ("GABA") is bound on the same GABA$_A$ receptor. Dr. Stevens testified that there is a finite amount a GABA in the brain, though the exact amount varies from person to person. Because of the finite amount of GABA, and the dependence of midazolam on the presence of GABA on the GABA$_A$ receptor, midazolam has a "ceiling effect," meaning its effectiveness levels off at a certain dose. Dr. Stevens testified that, as opposed to midazolam, barbiturates such as pentobarbital do not require the presence of GABA to work on a GABA$_A$ receptor. Therefore, midazolam is GABA dependent, while barbiturates are not.

Plaintiffs' witness Dr. Stevens also testified that benzodiazepines are partial agonists, while barbiturates are full agonists (Stevens Testimony, Vol. 2). Plaintiffs' witness Dr. Zivot testified that practitioners use benzodiazepines like midazolam rather than barbituates precisely because benzodiazepines have a ceiling effect (Testimony of Dr. Zivot, April 10, 2017, Vol. 1 ("Zivot Testimony, Vol. 1"). Benzodiazepines are safer for patients because it is a lower level of anesthesia (Zivot Testimony, Vol. 1).

The possibility or theory of a ceiling effect with midazolam seems to be fairly accepted (Dkt. No. 2-2 at 207), although defendants' witnesses Dr. Buffington and Dr. Antognini would not agree or concede that point at the hearing. However, the level at which the ceiling effect is demonstrated in humans, if there is a ceiling effect, is unknown. That is in part because it may occur when unsafe levels of midazolam have been dosed. This makes it difficult, if not impossible, to study in humans.

If there is a ceiling effect of midazolam, then midazolam's effect will level off after a certain dose of midazolam is administered, and administering more midazolam will not increase its effect. In other words, more midazolam in a protocol will not render a deeper state of sedation or general anesthesia, despite defendants' contentions to the contrary. This then makes all of the other executions using protocols and doses of midazolam different from the Arkansas Midazolam Protocol relevant to some extent to resolving this claim. This Court is mindful of the Eighth Circuit's admonition against resting an Eighth Amendment method of execution claim under the first prong of *Baze* on "entirely on hypothetical and speculative harms that, if they were to occur, would only result from isolated mishaps." *Zink v. Lombardi*, 783 F.3d 1089, 1099 (8th Cir.) (en banc), *cert. denied*, 135 S. Ct. 2941 (2015). Here, those other executions become relevant, at least to some extent, in regard to the science being argued.

Defendants rely on the one published scientific study conducted in humans regarding the effects of midazolam on humans at certain doses to assert that there is a linear dose response with midazolam that is fairly predictable and that there is no ceiling effect demonstrated (Buffington Testimony). Further, Dr. Antognini takes the position that it is unlikely GABA would ever be depleted, discounting the theory of the ceiling effect, but disclaiming much knowledge beyond that about how the process works (Antognini Testimony).

Defendants' attempts to reject the ceiling effect and to claim that midazolam has a linear dose response are undercut for the reasons discussed above which, in this Court's view, limit the usefulness of the human study to support defendants' theory of the case. Defendants' attempts are further undercut by animal and *in vitro* studies on which plaintiffs rely that purportedly have studied the ceiling effect and have reached fairly uniform results when attempting to identify the level at which midazolam causes the ceiling effect in those experiments (Dkt. No. 202, at 224,

Table 6).  These are the animal and *in vitro* studies defendants' witnesses and their counsel challenge as not being based on human subjects, while defendants' own expert, Dr. Antognini, proceeds to rely on animal and *in vitro* studies to the extent those studies support defendants' theory (Antognini Testimony).  Further, during cross examination, Dr. Antognini was forced to admit that he has previously testified under oath that at a clinical dose, he would expect to start to see what he termed "the knee in the curve," and what plaintiffs' counsel termed the ceiling effect, of midazolam (Antognini Testimony).  He conceded his understanding of the literature is that, at 20 mg to 25 mg doses of midazolam, he would expect the effect to start leveling off (Antognini Testimony).  Again, this appears to contradict the testimony of defendants' other expert Dr. Buffington.

These witnesses also are testifying regarding the possible effects of midazolam based on what they experience and observe in a clinical setting, using midazolam in much lower doses in a clinical setting to treat actual patients.  Plaintiffs' expert Dr. Zivot testified that, in his experience, the dose response for midazolam can vary by individual based on his observations administering doses as low as 1 mg or 2 mg and as high as 10 mg (Zivot Testimony, Vol. 1).  Dr. Zivot also relayed clinical experiences he has had with patients where his observation is that the level of sedation varies by dose and by individual.  He describing detailed conversations he has had with patients who have been administered midazolam only to have those patients have no memory of the conversation later (Zivot Testimony, Vol. 1).

Numerous witnesses for plaintiffs repeated that, in a clinical setting, they would not advise or use midazolam as the sole agent for sedation or general anesthesia outside of very limited, specific circumstances (Zivot Testimony, Vol. 1; Testimony of Dr. Zivot, April 13, 2017, Vol. 4 ("Zivot Testimony, Vol. 4"); Groaner Testimony).  Defense counsel questioned defendants'

witness Dr. Antognini very precisely to ask whether midazolam can reliably be used as the sole anesthetic for short, painful procedures – not really defining the terms short or painful. Dr. Antongini's response was not direct. Moreover, when asked later by defense counsel whether he had personally used midazolam for the induction of general anesthesia as the sole agent, Dr. Antognini testified that he could not remember whether he had done that – used it as the sole agent – because it would have been a long time ago and because he could not state for sure (Dr. Antognini Testimony, April 13, 2017, Vol. 4). This type of testimony does not lend credence to defendants' theory of the science. Further, defendants' witness Dr. Antognini qualified when this could be done by admitting on cross examination that some of the studies upon which he relied to opine about midazolam being a sole agent for anesthesia in fact administered midazolam through spinal injection, not the method Arkansas would be using here, or could not be read to discount a second opoid or other drug being given before or after the midazolam, or were in fact studying an effect all together different from consciousness or unconsciousness (Antognini Testimony). Dr. Antognini also opines in his report that three points must be achieved to reach general anesthesia: amnesia, unconsciousness, and immobility in response to noxious stimuli (Antognini Testimony). He offered testimony on direct examination about the Lazarus effect – movement in a brain-dead human – but admitted on cross examination that in his at least 30 years of medical practice, he had never seen the Lazarus effect (Antognini Testimony).

Defendants rely heavily on the uses and possible effects of midazolam based on what the Food and Drug Administration's Black Box Warning states regarding much smaller doses of midazolam in certain clinical settings. The Food and Drug Administration's Black Box Warning is not entirely internally consistent in its language, especially in regard to use of midazolam as an induction agent or as a sole agent for anesthesia. Further, this theory is subject to attack because

there are instances in which Federal Drug Administration Black Box Warnings are altered or modified based on clinical experience with the drug. Although defendants rely on the Black Box Warning, Dr. Buffington discusses in his report off label use which seems to contradict a reliance on the label (Dkt. No. 28-4). The Black Box Warning is perhaps one of defendants' stronger arguments, but overall, in the Court's estimation it does not significantly undercut the evidence plaintiffs mount to support their theory of this case at this stage of the proceeding.

As a result of the witnesses' testimony, questions were raised regarding the duration of any sedation achieved by midazolam. Defendants' witness Dr. Buffington takes the position that the duration of the effects of midazolam is not relevant in a lethal injection protocol because the midazolam should be given for "the low level of anesthesia and then the rapid administration of a second and third drug, each playing their own role. . . . The expectation to say you need maintenance is not clinically relevant either if the entire duration is short." (Buffington Testimony, Volume 3). From the testimony, it was not clear the length of time Dr. Buffington intended by using the phrase "short duration." From the Court's perspective, there was a distinction in how each side and their witnesses defined terms, used terms, and attempted to apply terms. The Court acknowledges the compressed schedule in which the evidence was presented may have impacted the ability to do this, but this deficiency played a role in assessing the credibility of testimony at this stage.

Further, Dr. Buffington's "short duration" explanation to discount midazolam's need to maintain sedation is difficult to reconcile with the execution of Joseph Wood in Arizona. On July 23, 2014, Arizona executed Mr. Wood by injecting him with 750 mg midazolam and 750 mg hydromorphone. Mr. Wood is reported to have gasped and snorted for nearly two hours before he finally died. The defendants concede that Arizona no longer uses a midazolam protocol for its

executions. Plaintiffs called as a witness Dale Baich, one of Mr. Woods' lawyers who witnessed his execution and had some knowledge of the negotiation with Arizona that lead to the agreement to no longer use a midazolam protocol. Aside from cross examination of Mr. Baich, in which suggestions were made as to alternate reasons why Arizona may have changed its protocol, defendants did not counter Mr. Baich's testimony.

Director Kelley maintains that Mr. Wood's execution in Arizona used a different protocol from the Arkansas Midazolam Protocol. She maintains that Arizona used a small dose of midazolam followed by a large dose of an opiod painkiller instead of the large dose of midazolam that is not followed by an opiod, as called for in Arkansas's protocol (Dkt. No. 28-1, at 6-7). Defendants presented no explanation from Dr. Buffington or Dr. Antognini to support this, and based on the scientific literature, it is not clear to the Court that this difference in protocol accounts for the two hour duration of Mr. Wood's execution. Several studies that were cited by both sides witnesses reported on a synergystic effect of benzodiazepenes and opoids, which the Court understands should lead to increased or magnified effectiveness. Again, in this Court's view, executions performed under different protocols and in different states are relevant at least to some extent in this analysis due to the parties' respective theories of the science.

With the science in mind, the Court turns to assess the witnesses' testimony as related to the Arkansas Midazolam Protocol. Plaintiffs argue that midazolam at a 500 mg or 1,000 mg dose has not been tested in humans, could not be tested in humans, and is not used in humans in a clinical setting at that dose. Plaintiffs contend that midazolam at a 500 mg or 1,000 mg dose, and even perhaps doses above the average clinical dose but below a 500 mg or 1,000 mg dose, does not have the ability as the sole agent to induce general anesthesia or unconsciousness. As a result,

plaintiffs maintain that a condemned inmate will experience the severe pain caused by injection of the second and third drugs in the Arkansas Midazolam Protocol.

Many witnesses testified that midazolam has no anelgesic effect, meaning it is not a pain reliever (Zivot Testimony, Vol. 1; Stevens Testimony, Vol. 2; Groaner Testimony). Even Dr. Antognini admitted it would not be his sole choice for pain relief (Antognini Testimony). In other words, if midazolam does not induce unconsciousness and render the condemned inmate insensate to pain, it will not act as pain reliever to blunt the effects of the second and third drugs in the Arkansas Midazolam Protocol.

Most of the witnesses who testified agreed that severe pain would result from the administration of the second and third drugs in the Arkansas Midazolam Protocol, absent a sufficient state of sedation or general anesthesia (Zivot Testimony, Vol. 1; Zivot Testimony, Vol. 4; Stevens Testimony, Vol. 2). Defendants' witness Dr. Buffington does not agree on this point as to vecuronium bromide, the second drug in the protocol (Buffington Testimony). When asked if he agreed with Dr. Buffington's statement that the administration of vecuronium bromide on an awake person would be a "peaceful experience," Dr. Antongini, disagreed with Dr. Buffington (Buffington Testimony, Vol. 2; Antognini Testimony). Dr. Antognini admitted that the method of death resulting from the administration of vecuronium bromide would be suffocation or the inability to breathe (Antognini Testimony). Dr. Buffington's unwillingness to concede even this point as to vecuronium bromide, and the fact that defendants' experts disagree among themselves on this point, casts some doubt. As to potassium chloride, Dr. Buffington conceded that patients are warned about potassium chloride and gave answers on cross examination as to this point that did not discount the proof plaintiffs presented (Buffington Testimony, Vol. 2).

Plaintiffs also posit that, even if a lower state of sedation, something below general anesthesia or unconsciousness, is able to be induced with midazolam as the sole agent, although midazolam may cause anterograde amnesia thereby causing the individual not to recall or remember the events that occurred while the sedation was in effect, midazolam does not take away the painful experience of the administration of the second and third drugs in the Arkansas Midazolam Protocol.  They present corresponding proof in the form of witness testimony from Dr. Zivot (Zivot Testimony, Vol. 1).  The Eighth Amendment prohibits cruel and unusual punishment, but it is not clear in the case law whether cruel and unusual punishment arises only from severe pain that a person can remember.  "[T]he Supreme Court has yet to tell us that inflicted pain that is not remembered does not count as severe pain for Eighth Amendment purposes."  *In re Ohio Execution Protocol Litig.*, No. 2:11-CV-1016, 2017 WL 378690, at *52 (S.D. Ohio Jan. 26, 2017), *aff'd sub nom. In re Ohio Execution Protocol*, No. 17-3076, 2017 WL 1279282 (6th Cir. Apr. 6, 2017).  Even defendants' witness Dr. Antognini testified as follows when asked by his own counsel whether he had formed an opinion if midazolam in the dose contemplated in the Arkansas Midazolam Protocol would be sufficient to render the inmate unconscious and insensate to any point that they might otherwise experience upon the administration of the second and third drugs in the protocol:

> My opinion is that the dose of midazolam that's contemplated or is proposed to be used in Arkansas would be sufficient to render the inmate unconscious and unable to sense noxious stimulation or the other things that would occur with the other drugs and, therefore, would render them unconscious and would not be able to sense them in the way that we think of that in the awake state.

(Antognini Testimony).  The Court does not fully understand Dr. Antongnini's response to this question, and the response appears to support, to some degree, plaintiffs' argument that severe pain will result from this protocol, even if it is not remembered.

The Court makes other observations that impact this Court's view of the proof presented by the parties. Plaintiffs argue that defendants' witness Dr. Buffington is not as credentialed or experienced as plaintiffs' witnesses. These issues are set forth in the motion *in limine* to exclude Dr. Buffington's testimony (Dkt. No. 30). Although in this Court's view, these issues do not impact Dr. Buffington's ability to offer testimony at this stage, these issues make him subject to cross examination based on his credentials and experience.

The Court acknowledges that plaintiffs' witness Dr. Stevens was cross examined effectively as to the table from the textbook he co-authored and regarding his arithmetic error when attempting to calculate the dose at which it would be possible to see the ceiling effect from midazolam. However, Dr. Stevens gained credibility by discussing the mechanism by which midazolam works and opining that it is not possible to alter that fundamental mechanism. Further, Dr. Antognini was cross examined regarding a chart in the textbook *Miller's Anesthesia* credited to him that he altered to some extent for his presentation in Court (Antognini, Vol. 4). The parties also explored whether midazolam acting alone has a lethal effect. Plaintiffs presented literature supporting their view that it does not while defendants' witness was forced to concede that he would not advocate a one drug lethal injection using midazolam, undercutting the notion that it has a lethal dose (Buffington Testimony).

The Court acknowledges defendants' effort to elicit testimony from witnesses "within a reasonable degree of medical certainty." At the outset, that standard is not required in this litigation. In a concurrence in *Baze*, Justice Alito, who was one of three Justices who formed the plurality opinion, suggested a stringent definition for availability. Justice Alito submitted that "an inmate should be required to do more than simply offer the testimony of a few experts or a few studies. Instead, an inmate challenging a method of execution should point to a well-established

scientific consensus." *Baze*, 553 U.S. at 67 (Alito, J., concurring). However, no Justices joined Justice Alito's concurrence, and Justice Alito did not include this standard when he authored the majority opinion in *Glossip*. Further, based on the factors the Court has just described and the admitted limitations of the available science as related to humans, this seems like a high bar to reach and level of certainty to achieve based on the evidence of which the Court is aware at this stage of the proceeding and the limitations of human study at 500 mg, 1,000 mg, or higher doses of midazolam. With respect to this, the Court notes that Dr. Buffington has a statement in his written report that human study would be possible by obtaining and analyzing serum from bodies of executed inmates resulting from a midazolam protcol (Dkt. No. 28-4). He did not testify to this or explain this during his testimony.

Having examined the science and witness testimony related to it, the Court turns now to the anecdotal evidence. The Court recognizes that evidence of other executions using different lethal injection protocols has limited relevance to the Court's inquiry in this case. The Court also notes that it must presume ADC officials will act in accordance with the Arkansas Midazolam Protocol in evaluating plaintiffs' Eighth Amendment claims. However, the Court finds that the anecdotal evidence does have evidentiary value for the purpose of assessing the scientific opinions offered by the parties' experts. The Court will consider the anecdotal evidence for this limited purpose.

The Court observes that, at this stage of the litigation, the anecdotal evidence is more consistent with plaintiffs' theory of this case. The Court concedes that anecdotal evidence is not always correct but often is compelling. Plaintiffs rely on testimony from witnesses to executions from other states that appear to have gone wrong. This testimony is personal and rings true. Defendants seek to dismiss many of these occurrences based on differences in the execution

protocols. That case is not so easily made, however, due to plaintiffs' arguments regarding the ceiling effect and articles about the synergistic effects of midazolam and opoids. Plaintiffs rely on these arguments to assert that, regardless of the dose of midazolam or the existence of opoids in other protocols as compared to the Arkansas Midazolam Protocol, these incidents are relevant. Further, defendants cross-examined these lay witnesses to some extent based on a lack of medical qualifications, suggesting that this in some way undermines what the witnesses observed, yet defendants argue that medical qualifications and clinical medical standards are not necessary to perform execution by lethal injection.

Overall, in this country, the number of executions carried out using a midazolam protocol is relatively low when compared to the total number of executions in the same period. Director Kelley investigated approximately 20 such executions involving midazolam. Plaintiffs point to four executions from other states using a midazolam protocol that plaintiffs contend went wrong. Those four executions represent a higher percentage, if the overall number of executions involving midazolam is low. Again, Director Kelley attempts to distinguish certain of those four executions by claiming there are differences in the midazolam protocols used in those states and the Arkansas Midazolam Protocol. For the reasons explained, that distinction is not so easily drawn.

Director Kelley also asserts that 15 of those 20 executions she investigated took place in Florida and that there were no problems with those executions. On the witness stand, when asked by plaintiffs' counsel, Director Kelley disclaimed knowledge of the Florida execution protocol as compared to the Arkansas Midazolam Protocol. Director Kelley disclaimed knowledge about the Florida protocol, despite having spoken to Florida corrections officials about their experience with midazolam. Further, the Court notes she seemed very informed on the protocols in the states where the difference in protocol serves as defendants' basis on which to distinguish executions utilizing

midazolam that have had problems. Director Kelley offers hearsay testimony only from her conversations with Florida officials to claim that Florida has abandoned it midazolam execution protocol because of an inability to obtain the drug.

Plaintiffs admitted the Florida protocol into evidence at the hearing, and this Court understands that the Florida protocol requires the very quick administration of drug two, the paralytic, after the injection of midazolam (Plaintiffs' Hearing Exhibit 22). This is different than the Arkansas Midazolam Protocol. As the Court understands plaintiffs' claim, the practical effect of Florida's protocol is that, if the inmate is not rendered unconscious and is instead experiencing distress, the inmate is paralyzed by the second drug and unable to communicate that experience to witnesses.

Plaintiffs' witness Dr. Zivot also examined the autopsy reports of several Florida inmates executed in the manner called for by the Florida protocol (Zivot Testimony, Vol. 1, Zivot Testimony, Vol. 4). Dr. Zivot testified that the results of several of the autopsies suggest that death was not instantaneous under the Florida protocol but instead occurred slowly, with impaired circulation or injury causing fluid to fill the lungs. Dr. Zivot offered testimony that this would cause a terrifying experience with the person feeling like his lungs are filling with fluid. Dr. Zivot likened it to when fluid goes into an individual's lungs, causing the individual to aspirate the liquid and cough violently in an effort to expel the fluid. Here, if the second drug in the execution protocol, the paralytic, was administered quickly, those efforts to expel the fluid would not be observed in the condemned inmate. The description of the effects of this are not unlike the descriptions used by lay witnesses who have observed executions utilizing a midazolam protocol in which the second drug is not administered as quickly. Although defendants' counsel cross examined Dr. Zivot on these autopsies, defendants' witnesses did not address them.

Defendants presented evidence of what may be safeguards in the Arkansas Midazolam Protocol. If the 500 mg dose or 1,000 mg dose of midazolam does not work as defendants predict, plaintiffs have established that Arkansas's Midazolam Protocol creates a demonstrated risk of severe pain as a result of the administration of the second and third drugs in the protocol, vecuronium bromide and potassium chloride. To the extent defendants present evidence that a competent IV team will be setting the IVs to administer the three lethal drugs and that competent individuals will be monitoring the infusion site throughout the execution process, those safeguards prevent against improper administration of the three drugs in the Arkansas Midazolam Protocol but do nothing to address what occurs if the midazolam does not work as defendants predict.

ADC Deputy Director Griffin testified that there is no set time in the Arkansas Midazolam Protocol for him to mix the necessary drugs. There is evidence presented by plaintiffs' witness Dr. Zivot that discusses the possibility of these drugs settling out and not being administered in the necessary dose (Zivot Testimony, Vol. 1).

Defendants rely on the consciousness check in the Arkansas Midazolam Protocol to safeguard against the effects of midazolam not working as defendants predict, but witness testimony and anecdotal evidence from other executions limits the effectiveness of this safeguard. Further, all admit the condemned inmate will be restrained to the gurney during the execution, which undercuts to some extent the types of outward signs of consciousness that lay witnesses will be able to observe and that defendants' expert Dr. Antognini opines would be necessary to demonstrate consciousness (Antognini Testimony). Likewise, based on witness testimony and anecdotal evidence, there appears at least a possibility that if the midazolam does not operate as defendants predict and instead has the ability to sedate the inmate quickly but not for a duration necessary to complete all injections contemplated by the Arkansas Midazolam Protocol, the inmate

may regain some level of consciousness during the process before the second and third drugs are administered.

The Court notes that an ADC witness testified that, due to the compressed schedule of the executions, the ADC has been unable to conduct the number of practices for these executions as were conducted for past executions, although the Court acknowledges the ADC is practicing to some extent (Reed Testimony, Vol 2; Kelley Testimony, Vol. 4).   While ADC officials testified as to the importance of debriefings after the executions, ADC officials testified that they will be unable to conduct debriefings between the first and second executions each night.   ADC officials gave testimony leaving a sense that, although they will participate in the executions, they had not seen all of the protocols and were unsure as to exact role and authority during the executions (Griffin Testimony, Reed Testimony).   This type of testimony raises concern because the Arkansas Midazolam Protocol does not provide a contingency plan addressing the procedure if something goes wrong in the execution.   The parties do not have established plans other than what is provided in the Arkansas Midazolam Protocol.   Based on the testimony presented by witnesses in this Court, there is not an established plan known by those involved in the execution for if or when lifesaving techniques will be used, and how they will be implemented, if complications arise during an execution (Griffin Testimony, Vol. 3, at 858; Kelley Testimony, Vol. 4).   As Director Kelley testified:

> Q:   If there's movement after the second backup set of midazolam is administered, if necessary, are you going to defer to the designee's determination of whether the inmate is conscious or unconscious?
>
> A:   I don't believe that there is any possibility that that's going to happen. But if for some out-of-this-world experience, we gave that midazolam and the inmate is not unconscious, then I'm going to close the curtains and I am going to call the governor and say, it didn't work, it's not working.

(Kelley Testimony, Vol. 4). The ADC does not have antidotes for the three drugs it will administer, despite the fact that antidotes are known and available (Griffin Testimony). The ADC does not have a plan in place regarding whether executions will be canceled or postponed if they experience complications in one or more of the earlier executions.

The Court does not doubt the good faith of ADC officials, including but not limited to Director Kelley. Deputy Director Griffin, and Mr. Reed, in trying to conduct safely this process. However, the schedule imposed on these officials, as well as their lack of recent execution experience, causes concern. For these reasons, the Court finds that there is a significant possibility that plaintiffs will succeed on the merits under the first prong of *Baze/Glossip*.

### b. Substantial Risk Compared To Known And Available Alternatives

The Supreme Court established in *Baze* and *Glossip* that a prisoner cannot succeed on a method of execution claim by merely showing that a state's method of execution presents a demonstrated risk of severe pain. As this stage, plaintiffs must establish a significant possibility that the risk of Arkansas's proposed method of execution is substantial when compared to known and available alternative methods. *Glossip*, 135 S. Ct. at 2737.

The Supreme Court has provided little guidance as to the meaning of "availability" in this context, other than by stating that the alternative method must be "'feasible, readily implemented, and in fact significantly reduce a substantial risk of severe pain.'" *Id.* (quoting *Baze*, 553 U.S. at 52). In *Glossip*, the Court concluded that the district court's finding that sodium thiopental and pentobarbital were unavailable was not clearly erroneous where "the record show[ed] that Oklahoma has been unable to procure those drugs despite a good-faith effort to do so." *Id.*, at 2726. Following *Glossip*, the Eighth Circuit found that a condemned prisoner's "threadbare assertion that lethal gas is *legally* available in Missouri is not the same as showing that the method

is a feasible or readily implementable alternative method of execution." *Johnson v. Lombardi*, 809 F.3d 388, 391 (8th Cir.), *cert. denied*, 136 S. Ct. 601 (2015) (emphasis in original). Left with little guidance as to how plaintiffs can attempt to satisfy their burden of demonstrating that an alternative method is available to a state, courts have developed their own standards.

The United States Courts of Appeals for the Sixth and Eleventh Circuits have elaborated on their understanding of availability, and they appear to disagree as to its meaning and the burden plaintiffs have in demonstrating that an alternative method is available. While these decisions are not binding on this Court, they demonstrate that Circuit Courts of Appeals have different interpretations of the second prong of *Glossip*.

### i.      Eleventh Circuit

In 2016, the Eleventh Circuit found that an Alabama district court did not err in denying a condemned prisoner's method of execution claim after holding a two-day bench trial. *Arthur v. Comm'r, Alabama Dep't of Corr.*, 840 F.3d 1268, 1320 (11th Cir. 2016), *cert. denied sub nom. Arthur v. Dunn*, 137 S. Ct. 725 (2017). The prisoner challenged the state of Alabama's lethal injection protocol, which provided for "(1) a 500–mg dose of midazolam, (2) followed by a 600–mg dose of rocuronium bromide, and (3) finally, 240 milliequivalents of potassium chloride." *Id.*, at 1274. The prisoner offered two potential alternative methods of lethal injection: compounded pentobarbital and sodium thiopental. *Id.*, at 1277. He later sought to amend his second amended complaint to plead the firing squad as an available alternative method of execution. *Id.*, at 1314.

After reviewing *Glossip* as well as its own decisions interpreting *Glossip*, the Eleventh Circuit concluded that the second prong of *Baze*/*Glossip* requires that a condemned prisoner prove that:

> (1) the State actually has access to the alternative; (2) the State is able to carry out the alternative method of execution relatively easily and reasonably quickly; and (3) the requested alternative would "in fact significantly reduce [ ] a substantial risk of severe pain" relative to the State's intended method of execution.

*Id.*, at 1300 (quoting *Glossip*, 135 S.Ct. at 2737; *Brooks v. Warden*, 810 F.3d 812, 819-23 (11th Cir.), *cert. denied sub nom. Brooks v. Dunn*, 136 S. Ct. 979 (2016)).  Under that framework, the Eleventh Circuit determined that the district court's finding that the prisoner failed to meet his burden under the second prong of *Baze/Glossip* was not clearly erroneous because:  (1) the prisoner conceded that the Alabama Department of Corrections' ("ADOC") supply of commercially manufactured pentobarbital expired two years prior to his trial; (2) the prisoner's expert was unable "to point to any source willing to compound pentobarbital for the ADOC;" and (3) a lawyer for the ADOC testified at trial that "despite contacting 29 potential sources for compounded pentobarbital (including the departments of corrections of four states and all of the compounding pharmacies on [plaintiff's expert's] list), she was unable to procure any compounded pentobarbital for the ADOC's use in executions."  *Id.*, at 1301.

The Eleventh Circuit also:

> [E]xpressly [held] that the fact that other states in the past have procured a compounded drug and pharmacies in Alabama have the skills to compound the drug does not make it available to the ADOC for use in lethal injections in executions. The evidentiary burden on Arthur is to show that "there is *now* a source for pentobarbital *that would sell it to the ADOC for use in executions*."

*Id.*, at 1302 (emphasis in original) (quoting *Brooks*, 810 F.3d at 820).

The Eleventh Circuit also rejected the prisoner's argument that the district court improperly denied him leave to amend his complaint to plead the firing squad as an alternative method of execution "when compared to Alabama's planned lethal-injection method of execution that has been repeatedly approved by the courts and successfully carried out in the past."  *Id.*, at 1315 (citing *Glossip*, 135 S.Ct. at 2734, 2740–46).  The Eleventh Circuit noted certain practical realities

that weighed against finding that the firing squad was a known and available alternative method of execution, *Id.*, at 1318-19. The court specifically noted that the firing squad was not a permitted method of execution under Alabama's death penalty statute and was at least hesitant to consider whether the firing squad was actually an available alternative method as the prisoner did "not argue or even suggest" that lethal injection and death by electrocution—the two methods that were available under the statute—were *per se* unconstitutional." *Id.*, at 1316. The Eleventh Circuit noted that, "if a state's sole method of execution is deemed unconstitutional, while other methods remain constitutional (even if they are not authorized by the state statute), our inquiry into whether those other options are feasible and readily implemented would be a different one." *Id.*, at 1319.

### ii.     Sixth Circuit

On April 6, 2017, the Sixth Circuit Court of Appeals affirmed a district court's decision to grant plaintiffs' motion for a preliminary injunction enjoining the state of Ohio from executing plaintiffs using a three drug, midazolam protocol. *In re Ohio Execution Protocol*, No. 17-3076, 2017 WL 1279282, at *17 (6th Cir. Apr. 6, 2017). As in this case, the Ohio lethal injection protocol at issue called for a "500-milligram injection of midazolam" followed by a consciousness check. *Id.*, at *19 (Kethledge, J. dissenting). Like Arkansas's protocol, if corrections officials determined that the prisoner remained conscious, officials would inject "another 500 milligrams of midazolam." *Id.* (Kethledge, J. dissenting). "After confirming that the prisoner is unconscious, the team can then administer the second" drug, a paralytic, and the third drug, potassium chloride. *Id.* (Kethledge, J. dissenting).

After affirming "the district court's factual finding that 'use of midazolam as the first drug in a three-drug execution protocol will create 'a substantial risk of serious harm[,]'" the Sixth Circuit turned its attention to the second prong of *Baze*/*Glossip*. *Id.*, at *8. The district court found

that plaintiffs satisfied their burden of proof under this prong by identifying compounded pentobarbital as a known and available alternative method of execution that entails a lesser risk of pain. *Id.*, at *8. The Sixth Circuit affirmed the district court, concluding that the district court's finding was not clearly erroneous despite the fact that there was no dispute that "Ohio does not currently have pentobarbital on hand and cannot purchase pentobarbital to use in executions directly from drug manufacturers." *Id.*

The district court found that there was no dispute that using a barbiturate like compounded pentobarbital:

> Either as the first drug in a three-drug protocol or as the sole drug, would be preferable to the current Ohio protocol in that it would eliminate the side effects observed in midazolam-involved executions identified in the lay testimony and would also eliminate (or at least reduce to a constitutionally acceptable level) the risk of subjecting the inmate to severe pain.

*In re Ohio Execution Protocol Litig.*, 2017 WL 378690, at *53. Therefore, the key question before the district court was whether barbiturates were "available" for the purposes of *Baze/Glossip*. *Id.* The district court noted that, "[a]lthough apparently some States have been able to obtain pentobarbital for executions, Ohio's efforts to obtain the drug from other States and from non-State sources have not met with success." *Id.* However, the district court also noted that Dr. Buffington, who testified as an expert witness for the defendants before the Ohio district court, "'stated in his affidavit in [another] case that since other states had been able to procure compounded pentobarbital for their executions, he believed it could be obtained.'" *In re Ohio Execution Protocol*, 2017 WL 1279282, at *8 (quoting *In re Ohio Execution Protocol Litig.*, 2017 WL 378690, at *95).

The district court concluded that "[t]here remains the possibility that Ohio can obtain the active pharmaceutical ingredient of pentobarbital and have it made into injectable form by a

compounding pharmacy." *In re Ohio Execution Protocol Litig.*, 2017 WL 378690, at *53. Recognizing that states have had difficulty acquiring drugs for lethal injection due to public controversy surrounding their use for that purpose, the district court found it was critical that "[t]he Ohio General Assembly has taken steps to protect the anonymity of potential suppliers and compounders" and that "[t]his Court and the Sixth Circuit have upheld and applied the confidentiality provisions of those statues, which were represented . . . as necessary to obtain possible suppliers of execution drugs." *Id.*, at *54. Based on these findings, and particularly in the light of the fact that defendants' own expert expressed his belief that states could acquire compounded pentobarbital for use in executions, the district court concluded that, "[w]hile compounded pentobarbital will not be available to Ohio to permit it to execute the above Plaintiffs *on the dates now set*, . . . Plaintiffs have met their burden to identify a sufficiently available alternative method of execution to satisfy *Baze* and *Glossip*." *Id.* (emphasis added). After reviewing the evidence, the Sixth Circuit concluded that:

> [G]iven the deferential standard of review that we must apply to the district court's finding that an alternative method is available, the limited guidance from the Supreme Court about the meaning of "available," and the reasonable definition of "available" that Plaintiffs offer, we must defer to the district court's finding that compounded pentobarbital is available.

*In re Ohio Execution Protocol*, 2017 WL 1279282, at *9.

### iii.    Alternatives In This Case

After reviewing these decisions from the Sixth and Eleventh Circuits, the Court finds that the approach taken by the Sixth Circuit provides a better test for "availability" under *Glossip*. The Eleventh Circuit's understanding of "availability" places an almost impossible burden on plaintiffs challenging their method of execution, particularly at the preliminary injunction stage. Plaintiffs do not have access to almost any evidence that could be used to prove this claim. As Director

Kelley herself testified during the Court's evidentiary hearing, the state of Arkansas, which wants to hold these executions, was only able to acquire its current supply of drugs after passing a statute shielding the identity of its suppliers from disclosure. Even then, Director Kelley testified that the state's supplier decided to not receive payment based on the supplier's concern that it could lead to its disclosure. The Court questions how plaintiffs' counsel could obtain the necessary evidence from the supplier directly, given the circumstances.

Furthermore, the Eleventh Circuit's interpretation of *Glossip* may put plaintiffs' counsel in the position of offering a state the drugs that would be used to end their clients' lives. This Court doubts that the Supreme Court would place counsel in such an ethically tenuous position, and the Court finds nothing in *Baze* or *Glossip* that would compel such an understanding. This Court also finds that the Eleventh Circuit's limitation of alternative methods to those presently permitted under state law finds no textual basis in *Baze* or *Glossip*. As a practical matter, applying such a requirement seems unnecessary in this case, as the Arkansas legislature has consistently amended the Arkansas Method of Execution Act so that the ADC could acquire different drugs for use in lethal injection or utilize different methods for execution. For these reasons, the Court will analyze plaintiffs' proposed alternatives under the same standards recently approved by the Sixth Circuit.

Plaintiffs seem to offer several proposed alternatives to the Arkansas Midazolam Protocol. First, they argue that replacing midazolam in the existing three drug protocol with either manufactured or compounded pentobarbital is a feasible alternative that could be readily implemented and would significantly reduce a substantial risk of severe pain. Dr. Stevens' testimony demonstrated that unlike midazolam, pentobarbital can be used to induce general anesthesia (Stevens Testimony, Vol. 2; Plaintiffs' Hearing Exhibit 16, at 9). Dr. Buffington and Dr. Antognini did not dispute that conclusion (Buffington Testimony, Vol. 3; Antognini

Testimony, Vol. 4). Furthermore, Director Kelley also testified that she preferred using a barbiturate rather than midazolam (Kelley Testimony, Vol. 4).

Therefore, the Court finds that replacing midazolam with pentobarbital would significantly reduce a substantial risk of severe pain. The remaining question is whether pentobarbital, be it manufactured or compounded, is available.

The Court finds that plaintiffs established, at this stage of the proceedings, that there is a significant possibility that pentobarbital is available for use in executions. Plaintiffs offered evidence tending to show that Missouri obtained FDA-approved, manufactured pentobarbital in the recent past (Dkt. No. 2-2, Ex. 18). The Court notes that Missouri executed an inmate using pentobarbital as recently as January 31, 2017. *See Execution List 2017*, Death Penalty Information Center, https://deathpenaltyinfo.org/execution-list-2017 (last visited Apr. 14, 2017). Plaintiffs also argued that compounded pentobarbital is available to states for executions because certain states, namely Texas and Georgia, have carried out numerous executions in recent years with compounded pentobarbital. Texas and Georgia combined executed 20 inmates in 2016 and 2017 and used pentobarbital in all of these executions. *Id.*; *see also Execution List 2016*, Death Penalty Information Center, https://deathpenaltyinfo.org/execution-list-2017 (last visited Apr. 14, 2017). Critically, Dr. Buffington, *defendants' own expert witness*, reaffirmed his belief that states could acquire compounded pentobarbital for use in executions while he was under oath (Buffington Testimony).

In addition to this information, the Court notes that, like the state of Ohio, Arkansas passed a secrecy statute protecting the identity of suppliers of lethal injection drugs, which the Arkansas Supreme Court upheld. *See* Ark. Code Ann. § 5-4-617(i); *Kelley*, 496 S.W.3d at 360-67. Director Kelley and Mr. Griffin, who are responsible for acquiring lethal injection drugs for the state,

testified that the secrecy law was instrumental in allowing them to acquire the ADC's current supply of drugs. The Court finds that there is a significant possibility that plaintiffs could establish that either manufactured or compounded pentobarbital are available for the purposes of the second prong of *Glossip*.

Plaintiffs argue that removing vecuronium bromide from the three drug protocol would satisfy the second prong of *Baze/Glossip*. While this method is obviously "available," the Court finds that it does not qualify as an adequate alternative. Plaintiffs' own experts testified that an inmate would experience severe pain if injected with potassium chloride without being properly anesthetized. According to their testimony, removing vecuronium bromide would not lessen the pain of the potassium chloride.

Plaintiffs also seem to argue that execution using a massive dose of sevoflurane as the sole lethal agent would significantly reduce the pain and suffering inherent in the Arkansas Midazolam Protocol. The Court heard testimony that sevoflurane is a gas that has the same mechanism of action as barbiturate drugs and, like barbiturates, is sufficient to cause death on its own. Joseph Cummings, an investigator for the Federal Public Defender Office for the Eastern District of Arkansas, testified that sevoflurane is available to the Arkansas Department of Correction for use in executions from Piramal Critical of Bethlehem, Pennsylvania (Cummings Testimony, Vol. 1). Plaintiffs also offered evidence demonstrating that the equipment required for administration of Sevoflurane is available from online vendors, and medical expertise is not required to operate that equipment (Dkt. No. 2-2, Ex. 16, at 35).

While the Court is cognizant of the fact that sevoflurane has not been used as a sole lethal agent in an execution, the Court is not prepared, at the preliminary injunction stage, to find that it is unavailable as an alternative method on this basis. In his expert report, Dr. Stevens states that

"[s]evoflurane is an ideal inhalational agent, as it can be also be used for induction of anesthesia and therefore substitute for an IV general anesthetic like thiopental, pentobarbital, or propofol" (Plaintiffs' Exhibit 16, at 35). Dr. Stevens states that "[b]ecause inhalational agents like sevoflurane are even more potent than barbiturates, they can be used in over-dosage as the sole lethal agent and would produce a rapid and painless death" (*Id.*). According to Dr. Stevens, "[t]he procedures for administering an anesthetic gas requires less training than placement and delivery of a drug by IV" and "[e]quipment costs are relatively inexpensive, with used Anesthesia Machines, including sevoflurane and isoflurane vaporizers, available on Ebay and other medical-equipment-resale sites for around $2,000" (*Id.*). Therefore, the Court finds that plaintiffs have shown that there is a significant possibility that sevoflurane is an available alternative method under the second prong of *Glossip*.

Plaintiffs offer nitrogen hypoxia as an alternative to the Arkansas Midazolam Protocol. Nitrogen hypoxia is a process in which gas displaces a person's oxygen supply, thereby causing rapid unconsciousness and a painless death within minutes (Dkt. No. 2-2, Ex. 22 and 23). The state of Oklahoma recently studied and adopted hypoxia as a feasible execution method (Dkt. No. 2-2, Ex. 22). The state of Louisiana has also studied hypoxia as an execution method (Dkt. No. 2-2, Ex. 23). Both Oklahoma and Louisiana concluded that the supplies needed for nitrogen hypoxia are widely available for purchase (Dkt. No. 2-2, Ex. 22 and 23). The Court finds that, at this stage of this case, plaintiffs have demonstrated a significant possibility that nitrogen hypoxia is an available alternative to the Arkansas Midazolam Protocol.

Finally, plaintiffs offer the firing squad as an alternative. The last execution by firing squad was in Utah in 2010. Plaintiffs offered Utah's firing squad protocol as an exhibit ("Utah Protocol") (Plaintiffs' Hearing Ex. 17). The Court heard testimony from Dr. Jonathan Groaner, who has done

extensive research in the areas of physician participation in lethal injection, and holds the opinion that the Arkansas Midazolam Protocol presents a far greater risk of causing pain and suffering compared to the firing squad (Dkt. No. 2-2, Ex. 19, at 266-67; *see also* Groaner Testimony). Dr. Groaner testified that midazolam is not a general anesthetic and, to his knowledge, is not used as a sole agent for any surgical procedure (Groaner Testimony). Dr. Groaner is of the opinion that there is a difference in assessing a level of consciousness and the depth of an anesthetic (Groaner Testimony). Dr. Groaner confirms midazolam is not an anelgesic (Groaner Testimony).

Dr. Groaner has been taking care of trauma patients and burn patients for much of his career (Groaner Testimony). He has experience treating patients who have gunshot wounds to the chest and specifically those who have been shot in the heart, which is what the Utah Protocol calls for (Groaner Testimony). The administration of drugs to cause respiratory arrest and cardiac arrest in an inmate medicated only with midazolam is "far more likely to cause a painful death" as compared to execution by firing squad (Dkt. No. 2-2, Exhibit 19, at 266-67; *see also* Groaner Testimony). Dr. Groaner testified that, if properly performed, which trained marksmen are able to do, execution by firing squad will cause a painless and near instantaneous death.

Dr. Groaner was asked to examine Mr. Broom who was to be executed by lethal injection in Ohio in September 2009. The personnel assigned to place Mr. Broom's IV were unsuccessful after trying for two hours. A physician was called into Mr. Broom's execution, but he also was not successful in placing an IV. As a result, the governor of Ohio called off Mr. Broom's execution (Groaner Testimony). Dr. Groaner examined and photographed Mr. Broom, and the various markings on his body, approximately one week after his attempted execution (Groaner Testimony, Plaintiffs' Hearing Exhibit 24). Mr. Broom had approximately 18 intravenous IV attempts from the attempted execution. In Dr. Groaner's opinion, Mr. Broom's veins were normal and anyone

with medical training should not have had a problem inserting an IV into Mr. Broom's veins (Groaner Testimony). These experiences, as well as his study of Utah's use of the firing squad in 2010, leads him to his conclusions regarding the use of the firing squad.

Dr. Groaner admitted on cross examination that he is not an expert in marksmanship (Groaner Testimony). Dr. Groaner concedes the Utah Protocol calls for a second volley due to the possibility that the first volley will not render the condemned inmate unconscious (Groaner Testimony). Dr. Groaner agrees that, if the first volley does not render the condemned inmate unconscious, the condemned inmate will experience pain.

Former ADC Director Larry Norris testified that, when he was director, the ADC had staff who were qualified with firearms, knew how to use firearms, and who could shoot for some distance. The ADC has guard towers with employees with firearms (Norris Testimony). Mr. Norris understands that, as of today, there are still qualification and training requirements for firearms for current ADC staff (Norris Testimony). Mr. Norris testified that it is important for ADC staff to be able to use firearms (Norris Testimony). Mr. Norris testified that the ADC has more than one kind of firearm and likely possesses over 100 firearms (Norris Testimony). Mr. Norris testified that ADC officers are trained to shoot at inmates only when absolutely necessary (Norris Testimony). Mr. Norris testified that, if asked by the Governor to execute an inmate by firing squad, although he would have to think about it, he is sure that he would get it done (Norris Testimony). He admitted that the Governor's ability to request that and his ability to carry that out depends on what the legislature authorizes as an available execution method (Norris Testimony).

The Court finds that, at this stage of litigation, plaintiffs have demonstrated a significant possibility that the firing squad is a reasonable alternative. The Court is not finding that the firing

squad is a feasible alternative to the Arkansas Midazolam Protocol, it simply acknowledges that plaintiffs have demonstrated that there is a significant possibility of it being so, based on the evidence presented to the Court during its evidentiary hearing.

### 2. Threat Of Irreparable Harm

The threat of irreparable harm to the plaintiffs is significant: if midazolam does not adequately anesthetize plaintiffs, or if their executions are "botched," they will suffer severe pain before they die. Defendants argue that plaintiffs "do not meet the standard for irreparable harm because their allegations and evidence of harm are entirely speculative" (Dkt. No. 29, at 21). As this Court finds that plaintiffs have shown a significant possibility that they will succeed on the merits of their method of execution claims based on midazolam, the Court rejects this argument and finds that this factor weighs in favor of granting preliminary injunctive relief.

### 3. Balancing And Public Interest

The state of Arkansas and its citizens have a "significant interest in meting out a sentence of death in a timely fashion." *Nelson*, 541 U.S. at 644. "'Only with an assurance of real finality can the State execute its moral judgment in a case. Only with real finality can the victims of crime move forward knowing the moral judgment will be carried out.'" *Nooner v. Norris*, No. 5:06CV00110 SWW, 2007 WL 2710094, at *7 (E.D. Ark. Sept. 11, 2007) (quoting *Calderon v. Thompson,* 118 S.Ct. 1489, 1501 (1998)). However, as plaintiffs have demonstrated that there is a significant possibility that they will succeed on the merits, and the threat of irreparable harm to the plaintiffs is significant, the Court finds that the balance of harms and public interest weigh in favor of a stay of execution.

## B. Plaintiffs' Rights to Counsel and Access to the Courts

Plaintiffs allege that Director Kelley's execution policies deprive them of their right of counsel under 18 U.S.C. § 3599, and, by extension, their First Amendment right of access to the courts to petition for redress from deprivations of their constitutional rights. Plaintiffs contend that, during the conduct of the execution, they have no meaningful access to the courts outside of their counsel's ability to contact the court. Consequently, the Court will consider the right to counsel and access to the courts claims together.

As a threshold matter, defendants cite Arkansas Code Annotated § 16-90-502 as their basis for limiting execution witnesses to one attorney per inmate and to prohibit audio and video recordings of executions (Dkt. No. 27, at 29). To the extent, if any, that this is in dispute, § 502(e)(5)(C) expressly outlaws audio or video recordings of executions. Such a regulation does not run afoul of the First Amendment. *Arkansas Times, Inc. v. Norris*, 2008 WL 110853 *4 (E.D. Ark. Jan. 7, 2008). Counsel for plaintiffs expressly disavow any "wish to record the executions;" rather, counsel for plaintiffs "wish only to be able to see and hear the entire execution, to have multiple counsel watch the execution, to have access to co-counsel and appropriate authorities in the event a problem arises," (Dkt. No. 31, at 28-29).

Therefore, the Court will assume that, for purposes of their claims alleging deprivations of the right to counsel and access to the courts, counsel for plaintiffs do not seek to record audio or video inside the prison facility. Rather, the Court understands plaintiffs to seek more than one attorney to be permitted to witness each execution, and that each attorney be guaranteed adequate telephonic access in order to communicate with co-counsel and the courts.

### 1. Director Kelley's Viewing Policies

At the outset, the Court notes that throughout the course of this litigation, Director Kelley appears to have taken three or four different positions regarding viewing policies. It is not altogether clear that any of these viewing policies provide adequate safeguards for plaintiffs' right to counsel or access to the courts. On March 10, 2017, plaintiffs' counsel sent a letter to Director Kelley requesting disclosure of Director Kelley's viewing policies on the dates of the execution (Dkt. No. 2-2, Exhibit 8). Specifically, plaintiffs' counsel sought disclosure of Director Kelley's policies regarding permission for plaintiffs' counsel to witness the execution in the viewing area, and the right of plaintiffs' counsel to bring telecommunications devices to the prison on the dates of the executions (*Id.*).

By letter to plaintiffs' counsel dated March 16, 2017, counsel for Director Kelley responded to the inquiry regarding viewing policies during the execution (Dkt. No. 2-2, Exhibit 9). Counsel for Director Kelley asserted that only one attorney per inmate would be permitted in the viewing room during the execution (*Id.*). Counsel for Director Kelley asserted that plaintiffs' counsel would not be permitted to bring cell phones or tablets inside the prison facility, but that Director Kelley would permit plaintiffs' counsel to "bring a lap[]top computer so long as the device is not equipped with photography, video, or audio recording capabilities" (*Id.*). The letter indicates that "if counsel decides to return to the deputy warden's office rather than proceeding to the viewing area, there will be two phone lines . . . for inbound or outbound calls." (*Id.*).

On March 20, 2017, counsel for Director Kelley sent an email to plaintiffs' counsel clarifying the viewing policies with regard to telephone access (Dkt. No. 2-2, Exhibit 10). The email indicates that "if the attorney chooses to go to the viewing area, she will have no access to a

phone during the execution" and that "the attorney will not be allowed to leave and then return to the viewing area.  No phone access in the viewing area." (*Id.*).

On April 3, 2017, counsel for Director Kelley sent to plaintiffs' counsel a letter containing a document entitled "Execution Protocol – Legal Counsel for Inmates with Scheduled Executions" (Dkt. No. 28-16).  This letter indicated that changes had been made to the previous viewing policies including "provisions for the second legal counsel for the inmate." (*Id.*).  By its terms, "one additional legal counsel will be allowed to enter the unit on the date of execution.  Such counsel shall be escorted to the Deputy Warden's office and shall remain there for the duration of his or her stay." (*Id.*) The attached execution protocol indicated that only one attorney may witness the execution, but that this attorney could be "escorted, as needed, to the Deputy Warden's Office, the visitation center, or the parking lot to depart." (*Id.*).

On April 6, 2017, Director Kelley signed an affidavit attached to defendants' response to plaintiffs' motion for preliminary injunction (Dkt. No. 28-1).  In the affidavit, Director Kelley articulated different viewing policies than were represented in the letter dated March 20, 2017.  Specifically, Director Kelley provided that "legal counsel may choose to be escorted to the witness room, or, in the alternative, choose to be escorted to the Deputy Warden's office or the visitation center.  *Legal counsel must remain in that chosen location until the execution is complete.*" (Dkt. No. 28-1, ¶ 46) (emphasis added).  Citing Arkansas Code Annotated § 16-90-502(e)(1)(E), Director Kelley stated that "Arkansas law and ADC policy have always allowed only one attorney for the condemned inmate to witness an execution." (Dkt. No. 28-1, ¶ 47).  Director Kelley stated that "at the request of the inmate, one additional legal counsel will be allowed to enter the unit," but that "such counsel shall be escorted directly to the Deputy Warden's office and shall remain there for the duration of his or her stay at the unit." (Dkt. No. 28-1, ¶ 48).  Director Kelley stated

that "all witnesses, including attorneys for the ADC, must surrender all cell phones, tablets, cameras, computers, and other recording devices at the ADC's Central Office in Pine Bluff before being transported to the Cummins Unit." (Dkt. No. 28-1, ¶ 50). "Two outbound phone lines will be made available at the holding cells for the use of legal counsel. Inbound and outbound phone lines and an inbound and outbound fax line will be made available in the Deputy Warden's office. An outbound phone line will also be made available in the Deputy Warden's office." Finally, Director Kelley stated that "legal counsel for the inmate will be permitted to bring a laptop computer into the unit and immediately to the Deputy Warden's office. Any such laptop computer shall remain in the Deputy Warden's office for the duration of legal counsel's stay." (Dkt. No. 28-1, ¶ 52).

During the evidentiary hearing in this case, Director Kelley testified about plaintiffs' counsel's access to the viewing room and outbound phone lines. Director Kelley testified that the plaintiffs' lawyers "would have to choose between calling the Court and advising them of something happening with [their] client or actually witnessing the execution[.]" (Testimony of Wendy Kelley, April 13, 2017, Vol. 4, at 1218). When the Court questioned Director Kelley, she testified that the viewing room is a three-minute car ride from the Deputy Warden's office, where the telephone is that the attorneys can use to access the Court. (*Id.*, at 1270). Director Kelley also answered somewhat ambiguously when asked whether the attorneys would be able to use a telephone in a "quiet cell," but asserted that "ideally, they would go to the front where they have a phone and a fax and everything." (*Id.*). By "front," the Court understands Director Kelley to be referencing the Deputy Warden's office.

Also at the evidentiary hearing, Director Kelley testified about the number of attorneys permitted to witness the executions. Director Kelley stated in no uncertain terms at the evidentiary

hearing that there was only room for one attorney to be present in the viewing room during the execution. However, Director Kelley acknowledged in her testimony that one of her predecessors permitted an additional attorney to witness executions (Testimony of Wendy Kelley, April 13, 2017, Vol. 4, at 1279). Director Kelley testified that there would be 24 chairs in the viewing room, which provided seats for "the victim's family members can be there, up to six of them. The inmate's attorney. The inmate's spiritual advisor, and then 12 citizen witnesses." (*Id.*, at 1135).

When the Court questioned Director Kelley about why 12 witnesses were necessary when the statute provides for six to 12, Director Kelley stated that "because I'm asking the witnesses to stay for two executions, I think that there's a chance that some of them won't, and I want to make sure I have at least six for the next one" (*Id.*, at 1273). The Court then asked "If you don't have more than six, if you have just the number you need, you have extra chairs in the witness room, would you entertain having lawyers come in if there's more than one lawyer for the inmate?" Director Kelley and her counsel answered ambiguously and stated that she would have to review the statute before answering that question (*Id.*, at 1273-74). Finally, with respect to the document entitled "Execution Protocol," which was attached to a letter dated April 3, 2017, Director Kelley testified that she had "the authority to make changes except for what the law tells me I can't change." (*Id.* at 1281; Defendant's Hearing Exhibit 16).

It is unclear which version of the viewing policies will be operative on the date of execution. For purposes of the motion for preliminary injunction, the key aspect of Director Kelley's viewing policy is that it would force plaintiffs' counsel to choose between witnessing the execution and contacting the Court in case anything should arise during the course of the execution itself.

### 2. Significant Possibility of Success on the Merits

#### a. Plaintiffs' Right of Access to the Courts

The Court has determined, by previous Order, that plaintiffs' right of access to the courts extend through the duration of their executions (Dkt. No. 53). The Court has also determined, in the same Order, that Director Kelley's viewing policies, as understood by the Court at this stage of the litigation, substantially interfere with plaintiffs' right of access to the courts (Dkt. No. 53). However, plaintiffs' right of access to the courts is not absolute. In the light of the substantial deference owed to the policies implemented by prison authorities, the issue before the Court is whether Director Kelley's viewing policies are reasonably related to legitimate penological interests.

#### b. Balancing Plaintiffs' Rights And *Turner* Deference

"Courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Turner v. Safley*, 482 U.S. 78, 84 (1987). "[C]ourts owe 'substantial deference to the professional judgment of prison administrators.'" *Beard*, 548 U.S., at 529 (quoting *Overton v. Bazzetta*, 539 U.S. 126, 132 (2003)). "Restrictive prison regulations are permissible if they are reasonably related to legitimate penological interests and are not an exaggerated response to such objectives." *Beard*, 548 U.S., at 529 (quoting *Turner*, 482 U.S. at 87) (internal citations omitted). "*Bounds* and *Turner* must be read *in pari materia*." *Lewis*, 518 U.S. at 361. "*Turner* applies to prison regulations relating to rights *not* typically subject to strict scrutiny," including access to the courts. *Roe v. Crawford*, 514 F.3d 789, 794 (8th Cir. 2008) (emphasis in original). Therefore, the Court will examine the four factors of the *Turner* test to determine whether the prison regulations at issue impermissibly deprive plaintiffs of their constitutional right of access to the courts and statutory right to counsel.

To guide this inquiry, *Turner* sets forth four factors that are relevant in determining the reasonableness of the regulation at issue:  First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate government interest put forward to justify it." *Turner*, 482 U.S. at 89 (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)).  Second, courts must consider "whether there are alternative means of exercising the right that remain open to prison inmates."  Turner, 482 U.S. at 90.  "A third consideration is the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally."  *Id.*  Finally, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation."  *Id.*

With respect to the first *Turner* factor, defendants assert two justifications for their viewing policies.  First, defendants claim that Arkansas Code Annotated § 16-90-502 mandates that only one attorney be permitted to witness each execution from the viewing room and also mandates that attorneys may not bring devices capable of recording audio or video to the prison (Dkt. No. 29, at 93).  Second, defendants assert that their viewing policies are "validly and rationally connected to maintaining security in the prison setting" (*Id.*).  The Court will address each justification in turn.

As to the first justification, the parties dispute whether the operative statute requires that only one attorney be permitted to witness an execution from the viewing room.  Arkansas Code Annotated § 16-90-502(e)(1)(E) provides, in relevant part that among those present for an execution shall be "counsel for the person being executed if he or she chooses to be present."  Defendants contend that this provision confines the number of "counsel" to one attorney, while plaintiffs contend "counsel" refers to one or more attorneys.  The Court notes that the plain language of the statute does not resolve this ambiguity.

However, during the evidentiary hearing Director Kelley testified that multiple attorneys for a condemned prisoner have been permitted to witness executions in the past (Testimony of Wendy Kelley, April 13, 2017, Vol. 4, at 1279). Also at the hearing, Director Kelley's immediate predecessor, Director Norris, testified that he could not recall whether multiple attorneys were permitted to witness executions during his tenure. In sum, this Court does not find that the statute requires that only one attorney be permitted to witness the execution in the viewing area. Therefore, the Court is unwilling to find that Arkansas law mandates the prison regulation at issue.

The defendants also claim that the prohibition against recording audio or video from the executions serves to avoid sensationalizing executions or dehumanizing condemned inmates; that the prohibition preserves the solemnity of executions; and that it protects the privacy and dignity of the condemned prisoner. Defendants are correct that Arkansas statute expressly outlaws audio or video recordings of executions. Ark. Code Ann. § 16-90-502(e)(5)(C). Moreover, such a regulation does not violate the First Amendment. *Arkansas Times*, 2008 WL 110853 at *4. However, it is unclear whether this prohibition presents a live controversy before the Court.

Counsel for plaintiffs expressly disavow any "wish to record the executions;" rather, counsel for plaintiffs "wish only to be able to see and hear the entire execution, to have multiple counsel watch the execution, [and] to have access to co-counsel and appropriate authorities in the event a problem arises" (Dkt. No. 31, at 28-29). Therefore, the Court will assume that counsel for plaintiffs do not seek to bring technology capable of recording audio or video inside the prison facility. The Court determines that implementation of the statutory prohibition of the recording of audio or video is not reasonably related to a prohibition on plaintiffs' counsel's access to devices that ensure communication with co-counsel or the courts.

For their second justification under the first prong of the *Turner* inquiry, defendants assert that their viewing policies are "validly and rationally connected to maintaining security in the prison setting" (*Id.*). The Eighth Circuit "accord[s] great deference to the judgment and expertise of prison officials, 'particularly with respect to decisions that implicate institutional security.'" *Murphy v. Missouri Dept. of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004) (quoting *Goff v. Graves*, 362 F.3d 543, 549 (8th Cir. 2004). The Eighth Circuit has consistently held that the maintenance of prison security may satisfy the first inquiry of *Turner*. *See, e.g., Murchison v. Rogers*, 779 F.3d 882, 888 (8th Cir. 2015) (prisons regulation upheld to serve the need of institutional security); *Rouse v. Benson*, 193 F.3d 936, 943 (8th Cir. 1999) (limitation on Lakota religious practice justified "in the interest legitimate penological goals such as prison security."). In the light of the proper deference owed to prison administrators, the Court concludes that there is a valid, rational connection between the viewing policies and legitimate security interests. Consequently, the Court must turn to the remaining prongs of the *Turner* test to determine whether the viewing policies are reasonable, or instead constitute "an exaggerated response" to the defendants' security concerns. *Turner*, 482 U.S. at 91.

With respect to the second *Turner* factor, it is unclear that Director Kelley's viewing policies afford plaintiffs an alternative means to effectuate their rights to counsel and access to the courts. The defendants' brief in response to the motion for preliminary injunction does not present any alternative means (Dkt. No. 29, at 94). During her testimony at the evidentiary hearing, Director Kelley suggested that, counsel for plaintiffs could be transported by car from the viewing room to the Deputy Warden's office, located in a separate building on the prison grounds, where counsel could use an outbound phone line to convene a hearing with a court (Testimony of Wendy Kelley, April 13, 2017, Vol. 4, at 1270-71).

This alternative is inadequate for two reasons. First, this policy would not allow for the lone attorney permitted in the viewing room to continue witnessing the execution should that attorney need to petition a court during the execution. Access to a telephone would require the attorney viewing the execution to leave the viewing room. As a result, the inmate would be left without counsel present during a period of the execution. This would violate plaintiffs' statutory right to have counsel witness their executions. Ark. Code Ann. § 16-90-502(e)(1)(E).

Second, access to an outbound telephone line that is located in a different building on the prison grounds substantially delays the ability for counsel to communicate with a court. According to Director Kelley's testimony, a witnessing attorney who sought to petition a court must first leave the witness room, enter a vehicle outside the execution building, be transported to a separate building on the prison grounds, and then travel to the Deputy Warden's office where an outbound telephone line would be provided. Minutes matter during an execution. Any delay diminishes the likelihood that a court could provide a meaningful remedy in the event of an ongoing constitutional deprivation. The Court determines that Director Kelley's policies, as they currently exist, do not provide to plaintiffs a sufficient alternative means to exercise their right to access to the courts. In effect, Director Kelley's viewing policies render as mutually exclusive the plaintiffs' right to have counsel witness the execution and the plaintiffs' right to access the courts.

As to the third inquiry mandated by *Turner*, this Court must consider the impact that accommodation of the plaintiffs' right to access to the courts will have on guards, other inmates, and on the allocation of prison resources generally. 482 U.S. at 90. If there is minimal impact imposed by accommodation of the right, then this factor "weighs against the reasonableness of the policy." *Roe*, 514 F.3d at 798.

Beyond their concerns regarding the recording of audio and video, Defendants do not appear to contend that permitting attorneys to bring a telephone, or providing an outbound line in the execution building, would impose substantial burdens on prison guards, other inmates, or the allocation of prison resources. Defendants assert that bringing two or more lawyers would "strain the ADC's limited space in the witness room." (Dkt. No. 29, at 94). Further, defendants assert that permitting plaintiffs' counsel to have access to recording devices would violate Arkansas statute and harm defendants' legitimate interests in preserving the solemnity of executions and the dignity of the condemned prisoners and their families (*Id.*). With respect to defendants' concerns regarding recording devices, the Court reaffirms that defendants may properly prohibit recording devices in the viewing room. Ark. Code Ann. § 16-90-502(e)(5)(C); *see Arkansas Times*. The Court turns to consider the impact of permitting more than one attorney on guards, other inmates, or the allocation of prison resources.

Arkansas law requires certain persons to be present at an execution:

(A) The director or an assistant designated by the director;
(B) The Department of Correction official in charge of medical services or his or her designee;
(C) No more than six (6) of the following persons related to a victim of a crime for which the person is being executed if he or she chooses to be present:
    (i)      A spouse;
    (ii)     Any parent or stepparent;
    (iii)    Any adult sibling or stepsibling; and
    (iv)    Any adult child or stepchild;
(D) A number of citizens determined by the director, not fewer than six (6) nor more than twelve (12), whose presence is necessary to verify that the execution was conducted in the manner required by law;
(E) Counsel for the person being executed if he or she chooses to be present; and
(F) The spiritual adviser to the person being executed if he or she chooses to be present.

Ark. Code Ann. § 16-90-502(e).

The parties dispute whether "counsel" is singular or plural for purposes of this provision. Regardless, assuming without deciding that "counsel for the person being executed" refers to a

single attorney, the Court determines that the maximum total of persons required by statute is 22. During her testimony at the evidentiary hearing, Director Kelley testified that there is room to seat at least 24 individuals in the viewing room (Testimony of Wendy Kelley, April 13, 2017, Vol. 4, at 1275). Director Kelley also testified that the viewing room could accommodate one additional person, or 25, by placing an additional seat in the room (*Id.*, at 1275). Director Kelley testified that there will be a corrections officer present in the viewing room as well, though it is unclear to the Court whether the officer would occupy one of the 24 seats (*Id.,* at 1218). Therefore, there appears to be sufficient room for at least one additional person to be seated in the viewing room during an execution, even if all 12 citizen witnesses view the execution. The Court determines that requiring additional counsel to be present would not impose an undue burden on space constraints in the viewing room based on the current evidence before the Court.

Based on the evidence in the record, the Court does not find that accommodations of plaintiffs' rights to counsel and access to the courts would cause a "significant 'ripple effect' on fellow inmates or on prison staff." *Turner*, 482 U.S. at 90 (quoting *Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 132-133 (1977)). Such accommodations would be made only in the limited circumstance of the duration of an execution. According to an exhibit attached to Director Kelley's affidavit, the State of Arkansas has executed 27 inmates since 1990, amounting to one execution per year (Dkt. No. 28-1, Exhibit A). Because the accommodations sought by plaintiffs are confined solely to the execution context, the Court determines that the accommodation of this right would have little impact on the allocation of prison resources generally, and few if any ripple effects on fellow inmates or on prison staff. For this reason, the Court determines that the third factor weighs against the reasonableness of Director Kelley's viewing policy. *See Roe*, 514 F.3d at 798.

Finally, regarding the fourth prong of the *Turner* test, "if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at a *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard." *Roe*, 514 F.3d at 798 (quoting *Turner*, 482 U.S. at 91). In their response to the motion to dismiss, plaintiffs offer three accommodations that they assert would provide adequate safeguards for plaintiffs' right to counsel and access to the courts (Dkt. No. 31, at 30-31). First, plaintiffs propose that Director Kelley permit two attorneys in the viewing area, "so that if the need to communicate with the court or co-counsel in the warden's office manifests itself, one can communicate with a court and co-counsel while the other remains in the viewing area to continue to watch the execution" (*Id.* at 30). Second, plaintiffs propose that Director Kelley permit "a witnessing attorney to bring a cell phone into the prison, <u>with the device held by prison authorities</u>, but brought into the viewing area to be given to the attorney only if there is a need to contact a court or co-counsel; or, alternatively, permit witnessing attorneys access to ADC-provided phone lines during the execution." (*Id.*) (emphasis in original). Finally, plaintiffs propose that Director Kelley permit the witnessing attorney to witness the execution from the time "[p]laintiffs enter the death chamber to pronunciation of death, and permit audio from the death chamber to the viewing area throughout the execution." (*Id.* at 30-31).

The Court determines that the evidence in the record demonstrates readily available alternatives to Director Kelley's viewing policies that would accommodate plaintiffs' rights to counsel and access to the courts. The viewing room has space to seat at least one additional member of plaintiffs' legal counsel, and there is evidence in the record that Director Kelley's predecessors have permitted multiple attorneys to witness executions in the past. Moreover, defendants have conceded their ability "to allow the Prisoners' attorneys to access a landline in

the execution building" (Dkt. No. 29, at 97).  Consequently, the Court determines that, though considerable deference is due to the judgment of prison administrators regarding matters of prison security, the ready availability of alternatives weighs against the reasonableness of Director Kelley's viewing policies.

### c.      Fashioning A Remedy

"It is the role of the courts to provide relief to claimants, in individual or class actions, who have suffered, or will imminently suffer, actual harm; it is not the role of courts, but that of the political branches, to shape the institutions of government in such fashion as to comply with the laws and the Constitution."  *Lewis*, 518 U.S., at 349.  "It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts." *Lewis*, 518 U.S., at 349.

As *Lewis* makes clear, a district court must "scrupulously respect[] the limits on [its] role," by "not . . . thrust[ing] itself into prison administration." Id. at 363.  In *Bounds*, "the court properly recognized that "determining the 'appropriate relief to be ordered . . . presents a difficult problem. *Lewis*, 518 U.S. at 362 (quoting *Bounds*, 340 U.S., at 818-819).  Rather than crafting its own remedy, the district court in *Bounds* "charge[d] the Department of Correction with the task of devising a Constitutionally sound program to assure inmate access to the courts." *Lewis*, 518 U.S. 362 (quoting Bounds, 340 U.S. at 818-819).  The State responded with a proposal, which the District Court ultimately approved with minor changes, after considering objections raised by the inmates." *Lewis*, 518 U.S., at 363 (quoting *Bounds*, 340 U.S., at 819-820).

The Court determines that plaintiffs are substantially likely to succeed on the merits of their claim that Director Kelley's viewing policies, in their current form, constitute unreasonable restrictions of plaintiffs' right to counsel and right of access to the courts.  On this basis, the Court

enjoins Director Kelley from implementing the viewing policies insofar as they infringe plaintiffs' right to counsel and right of access to the courts and will fashion a remedy consistent with *Bounds*.

## VII.    Conclusion

For the foregoing reasons:

1.    The Court finds that plaintiffs are entitled to a preliminary injunction based on their method of execution claim under the Eighth Amendment.  Defendants and all persons in active concert with them are enjoined during the pendency of this action from carrying into execution the death sentences of Jason McGehee, Stacey Johnson, Marcel Williams, Kenneth Williams, Bruce Ward, Ledell Lee, Jack Jones, Don Davis, and Terrick Nooner.

2.    The Court finds that plaintiffs are entitled to a preliminary injunction based on their challenge to Director Kelley's viewing policies, in their current form, as unreasonable restrictions of plaintiffs' right to counsel and right of access to the courts.  The Court enjoins Director Kelley from implementing the viewing policies insofar as they infringe plaintiffs' right to counsel and right of access to the courts.  With the parties' interest in swift resolution in mind, the Court charges Director Kelley with the task of devising a viewing policy that assures plaintiffs' right to counsel and access to the courts for the entire duration of all executions.  *See Lewis*, 518 U.S. 362.  The Court directs the parties to confer and jointly present to this Court an appropriately tailored viewing policy by 12:00 p.m., Monday, April 17, 2017.  Should the parties fail to come to agreement on the matter, the Court directs each to present proposals in writing by that time.

No bond will be required.

Dated this 15th day of April, 2017.

_____
Kristine G. Baker
United States District Judge